[No. D029461. Fourth Dist., Div. One. Apr. 16, 1999.]

BOLSA CHICA LAND TRUST et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
CALIFORNIA COASTAL COMMISSION, Real Party in Interest.

[No. D030270. Fourth Dist., Div. One. Apr. 16, 1999.]

CALIFORNIA COASTAL COMMISSION et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
BOLSA CHICA LAND TRUST et al., Real Parties in Interest.

## COUNSEL

Nossaman, Guthner, Knox & Elliott, Alvin S. Kaufer, John J. Flynn III and William M. Boyd for Petitioners Koll Real Estate Group, Inc., and Signal Bolsa Corporation.

Paul Horgan; Philip A. Seymour; and Deborah A. Cook for Petitioners and Real Parties in Interest Bolsa Chica Land Trust, Huntington Beach Tomorrow, Gabrielino Shosone Nation, Sierra Club and Surfrider Foundation.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Richard M. Frank, Assistant Attorney General, and Jamee Jordan Patterson, Deputy Attorney General, for Petitioner and Real Party in Interest California Coastal Commission.

No appearance for Respondent.

## OPINION

**BENKE, J.**—This case concerns development plans for a large tract of land in southern Orange County known as Bolsa Chica. Although the California Coastal Commission (Commission) approved a local coastal program (LCP) for Bolsa Chica, the trial court found defects in the program and remanded it to Commission for further proceedings. In this court both the opponents and proponents of the LCP contend that the trial court erred.

The opponents of the LCP contend the trial court erred in finding a planned relocation of a bird habitat was permissible under the Coastal Act. The proponents of the LCP contend the trial court erred in preventing residential development of a wetlands area and in requiring preservation of a

pond that would have been eliminated under the LCP in order to make room for a street widening. The proponents also attack the trial court's award of attorney fees to the opponents of the LCP.

We find the trial court erred with respect to relocation of the bird habitat. The Coastal Act does not permit destruction of an environmentally sensitive habitat area (ESHA) simply because the destruction is mitigated offsite. At the very least, there must be some showing the destruction is needed to serve some other environmental or economic interest recognized by the act.

We agree with the trial court's rulings as to the two substantive issues raised by the proponents of the LCP: on the record developed by Commission, neither residential development in the wetlands nor destruction of the pond is permissible. With respect to the trial court's award of attorney fees, we find no abuse of discretion.

FACTUAL BACKGROUND

Bolsa Chica is a 1,588-acre area of undeveloped wetlands and coastal mesas. Urban development surrounds Bolsa Chica on three sides. On the fourth side is the Pacific Ocean, separated from Bolsa Chica by a narrow strip of beach, coastal dunes and coastal bluffs.

Approximately 1,300 acres of Bolsa Chica consist of lowlands ranging from fully submerged saltwater in Bolsa Bay to areas of freshwater and saltwater wetlands and islands of slightly raised dry lands used by local wildlife for nesting and foraging. However, a large part of the lowlands is devoted to an active oil field and at one time the area was farmed.

The lowlands are flanked by two mesas, the Bolsa Chica Mesa on the north and the Huntington Mesa on the south. The Bolsa Chica Mesa consists of 215 acres of uplands hosting a variety of habitat areas. Although much of Huntington Mesa is developed, a long narrow undeveloped strip of the mesa abutting the lowlands is the planned site of a public park.

In 1973 the State of California acquired 310 contiguous acres of the Bolsa Chica lowlands in settlement of a dispute over its ownership of several separate lowland parcels and the existence of a public trust easement over other lowland areas.

In 1985 the County of Orange and Commission approved a land use plan for Bolsa Chica which contemplated fairly intense development. The 1985

plan allowed development of 5,700 residential units, a 75-acre marina and a 600-foot-wide navigable ocean channel and breakwater.

By 1988 substantial concerns had been raised with respect to the environmental impacts of the proposed marina and navigable ocean channel. Accordingly, a developer which owned a large portion of Bolsa Chica, a group of concerned citizens, the State Lands Commission, the County of Orange and the City of Huntington Beach formed the Bolsa Chica Planning Coalition (coalition). The coalition in turn developed an LCP for Bolsa Chica which substantially reduced the intensity of development. The coalition's LCP was eventually adopted by the Orange County Board of Supervisors. Commission approved the LCP with suggested modifications which were adopted by the board of supervisors.

As approved by Commission, the LCP eliminated the planned marina and navigable ocean channel, eliminated 3 major roads, reduced residential development from a total of 5,700 homes to 2,500 homes on Bolsa Chica Mesa and 900 homes in the lowlands and expanded planned open space and wetlands restoration to 1,300 acres.

The material features of the LCP which are in dispute here are: the replacement of a degraded eucalyptus grove on Bolsa Chica Mesa with a new raptor habitat consisting of nesting poles, native trees and other native vegetation on Huntington Mesa at the sight of the planned public park; the residential development in the lowland area which the LCP permits as a means of financing restoration of substantially degraded wetlands; and the elimination of Warner Pond on Bolsa Chica Mesa in order to accommodate the widening of Warner Avenue.

Throughout the approval process several interested parties and public interest groups, including the Bolsa Chica Land Trust, Huntington Beach Tomorrow, Shoshone-Gabrieleno Nation, Sierra Club and Surfrider Foundation (collectively the trust) objected to these and other portions of the LCP.

PROCEDURAL HISTORY

On March 6, 1996, the trust filed a timely petition for a writ of mandate challenging the LCP. In addition to Commission, the petition named two local agencies, the County of Orange and the Orange County Flood Control District, as real parties in interest. The petition also named a number of

landowners as real parties in interest. Of those landowners, only real parties in interest Koll Real Estate Group (Koll) and Fieldstone Company (Fieldstone) actively participated in the litigation.

On April 16, 1997, before the matter could be heard on the merits, Commission made a motion to have the LCP remanded to it so that Commission could reconsider the plan in light of the state's recent acquisition of Koll's lowland property and the state's adoption of an independent plan to fund restoration of degraded portions of the lowlands.[1] All the other parties in the litigation opposed Commission's motion to remand. The trial court deferred ruling on the state's motion until it conducted a hearing on the merits.

Upon hearing the merits of the trust's challenge, the trial court determined that, consistent with the requirements of the Coastal Act, the eucalyptus grove on Bolsa Chica Mesa could be eliminated in order to permit residential development there and the habitat which existed at the grove regenerated on Huntington Mesa. However, the trial court found that residential development of wetlands was not permitted by the act, even if it would fund restoration of other portions of the wetlands. The court found that although wetlands could be eliminated if needed for a road or highway, Commission had not made a required finding that the need to widen Warner Road outweighed the value of preserving Warner Pond.

Given its disagreement with Commission, the trial court remanded the entire LCP matter to Commission for further proceedings. The court found that, in light of its ruling on the merits and remand, the state's prior motion to remand was moot. The trial court awarded the trust its attorney fees and apportioned the award among Koll, Fieldstone and Commission.

## I

### Appealability

The trust, Fieldstone and Koll each filed a notice of appeal from the substantive portions of the trial court's judgment. Fieldstone, Koll and Commission also filed separate appeals challenging the trial court's attorney fee award.

Prior to oral argument we advised the parties of our concern that the trial court's order remanding this case to Commission was not appealable. (See

---

[1]Financing for the state's acquisition of Koll's lowland holdings as well as its restoration plan was provided by the Ports of Los Angeles and Long Beach as mitigation for the dredging and expansion that the ports planned.

*Board of Dental Examiners* v. *Superior Court* (1998) 66 Cal.App.4th 1424, 1430-1431 [78 Cal.Rptr.2d 653].) Notwithstanding the lack of appellate jurisdiction, the parties have asked that we reach the merits of their respective claims. Because of the public interest in this matter and because the case has been fully briefed on the merits, we will treat the appeals as petitions for writs of mandamus. (*Ibid.*)

## II

### *Standards of Review*

■ The standards which govern our review of the trial court's decision are set forth in our opinion in *Sierra Club* v. *California Coastal Com.* (1993) 19 Cal.App.4th 547, 556-557 [23 Cal.Rptr.2d 534] (*Batiquitos Lagoon*): "Because this matter came to the trial court on a petition for a writ of mandate under Code of Civil Procedure section 1094.5, the trial court was obligated to determine 'both whether substantial evidence supports the administrative agency's findings and *whether the findings support the agency's decision.*' [Citation.]

" '[T]he agency which renders the challenged decision must set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order. . . . By focusing . . . upon the relationships between evidence and findings and between findings and ultimate action, the Legislature sought to direct the reviewing court's attention to the analytic route the administrative agency traveled from evidence to action. In so doing, we believe that the Legislature must have contemplated that the agency would reveal this route.' [Citation.]

"While a reviewing court must make certain an agency has adequately disclosed its reasoning process, '*Topanga* reiterates the long established rule in California that administrative findings need not be as precise or formal as would be required of a court [citation]. Indeed, the Supreme Court there considered a planning commission's summary of "factual data" to be agency findings [citation]. . . . Other examples of the judiciary's willingness to focus on the substance rather than the form of administrative actions are legion. "As a practical matter, omissions in [administrative] findings may sometimes be filled by such relevant references as are available." [Citation.] Thus, where reference to the administrative record informs the parties and reviewing courts of the theory upon which an agency has arrived at its ultimate finding and decision it has long been recognized that the decision should be upheld if the agency "in truth found those facts which as a matter of law are essential to sustain its . . . [decision]." [Citations.]' [Citation.]

■ "In determining whether substantial evidence supports an agency's reasoning process, the trial court must look at the 'whole record.' [Citations.] 'The "in light of the whole record" language means that the court reviewing the agency's decision cannot just isolate the evidence supporting the findings and call it a day, thereby disregarding other relevant evidence in the record. [Citation.] Rather, the court must consider all relevant evidence, including evidence detracting from the decision, a task which involves some weighing to fairly estimate the worth of the evidence. [Citation.] [Citations.] That limited weighing is not an independent review where the court substitutes its own findings or inferences for the agency's. [Citation.] "It is for the agency to weigh the preponderance of conflicting evidence [citation]. Courts may reverse an agency's decision only if, *based on the evidence before the agency*, a reasonable person could not reach the conclusion reached by the agency." [Citation.]' [Citation.]

"Finally, '[o]ur role here is precisely the same as that of the trial court. " '[I]n an administrative mandamus action where no limited trial de novo is authorized by law, the trial and appellate courts occupy in essence identical positions with regard to the administrative record, exercising the appellate function of determining whether the record is free from legal error. [Citations.]' [Citation.] Thus, the conclusions of the superior court, and its disposition of the issues in this case, are not conclusive on appeal. [Citation.]" [Citation.]' [Citation.]"

III

*Administrative Interpretations*

A recurring dispute among the parties concerns the level of deference which we must accord Commission's interpretation of the Coastal Act. ■ The Supreme Court recently discussed the role of administrative interpretation at some length. (See *Yamaha Corp. of America* v. *State Bd. of Equalization* (1998) 19 Cal.4th 1, 10-13 [78 Cal.Rptr.2d 1, 960 P.2d 1031].) "It is a 'black letter' proposition that there are two categories of administrative rules and that the distinction between them derives from their different sources and ultimately from the constitutional doctrine of the separation of powers. One kind—quasi-legislative rules—represents an authentic form of substantive lawmaking: Within its jurisdiction, the agency has been delegated the Legislature's lawmaking power. [Citations.] Because agencies granted such substantive rulemaking power are truly 'making law,' their quasi-legislative rules have the dignity of statutes. When a court assesses the validity of such rules, the scope of its review is narrow. If satisfied that the rule in question lay within the lawmaking authority delegated by the Legislature, and that it

is reasonably necessary to implement the purpose of the statute, judicial review is at an end.

" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"It is the other class of administrative rules, those *interpreting* a statute, that is at issue in this case. Unlike quasi-legislative rules, an agency's interpretation does not implicate the exercise of a delegated lawmaking power; instead, it represents the agency's view of the statute's legal meaning and effect, questions lying within the constitutional domain of the courts. But because the agency will often be interpreting a statute within its administrative jurisdiction, it may possess special familiarity with satellite legal and regulatory issues. It is this 'expertise,' expressed as an interpretation (whether in a regulation or less formally, as in the case of the Board's tax annotations), that is the source of the presumptive value of the agency's views. An important corollary of agency interpretations, however, is their diminished power to bind. Because an interpretation is an agency's *legal opinion*, however 'expert,' rather than the exercise of a delegated legislative power to make law, it commands a commensurably lesser degree of judicial deference. [Citation.]

" . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"Whether judicial deference to an agency's interpretation is appropriate and, if so, its extent—the 'weight' it should be given—is . . . fundamentally *situational*. A court assessing the value of an interpretation must consider complex factors material to the substantive legal issue before it, the particular agency offering the interpretation, and the comparative weight the factors ought in reason to command. Professor Michael Asimow, an administrative law adviser to the California Law Revision Commission, has identified two broad categories of factors relevant to a court's assessment of the weight due an agency's interpretation: Those 'indicating that the agency has a comparative interpretive advantage over the courts,' and those 'indicating that the interpretation in question is probably correct.' [Citations.]

"In the first category are factors that 'assume the agency has expertise and technical knowledge, especially where the legal text to be interpreted is technical, obscure, complex, open-ended, or entwined with issues of fact, policy, and discretion. A court is more likely to defer to an agency's interpretation of its own regulation than to its interpretation of a statute, since the agency is likely to be intimately familiar with regulations it authored and sensitive to the practical implications of one interpretation over another.' [Citation.] The second group of factors in the Asimow classification—those suggesting the agency's interpretation is likely to be correct—

includes indications of careful consideration by senior agency officials ('an interpretation of a statute contained in a regulation adopted after public notice and comment is more deserving of deference than [one] contained in an advice letter prepared by a single staff member' [citation], evidence that the agency 'has consistently maintained the interpretation in question, especially if [it] is long-standing' [citation] ('[a] vacillating position . . . is entitled to no deference' [citation]), and indications that the agency's interpretation was contemporaneous with legislative enactment of the statute being interpreted. If an agency has adopted an interpretive rule in accordance with Administrative Procedure Act provisions—which include procedures (e.g., notice to the public of the proposed rule and opportunity for public comment) that enhance the accuracy and reliability of the resulting administrative 'product'—that circumstance weighs in favor of judicial deference. However, even formal interpretive rules do not command the same weight as quasi-legislative rules. Because ' "the ultimate resolution of . . . legal questions rests with the courts" ' [citation], judges play a greater role when reviewing the persuasive value of interpretive rules than they do in determining the validity of quasi-legislative rules." (*Yamaha Corp. of America* v. *State Bd. of Equalization, supra,* 19 Cal.4th at pp. 10-13.)

With these principles in mind we turn to the substantive issues raised by the parties.

## IV

### *Eucalyptus Grove*

#### A. *History and Condition of the Grove*

The LCP would permit residential development over five acres of a six-and-one-half-acre eucalyptus grove on Bolsa Chica Mesa. The five acres where development would be permitted is owned by Koll; the remainder of the grove is owned by the state.

The eucalyptus grove is not native to the area and was planted almost 100 years ago by a hunting club which owned large portions of Bolsa Chica. Since the time of its planting, the original 20-acre grove has diminished considerably because of development in the area and the lack of any effort to preserve it. Indeed, although the eucalyptus grove was nine and two-tenths acres large as recently as 1989, it had shrunk to no more than six and one-half acres by 1994 and portions of it were under severe stress. According to expert testimony submitted to Commission, the grove is probably shrinking because of increased salinity in the soil.

Notwithstanding its current diminished and deteriorating condition, Commission identified the grove as an ESHA within the meaning of Public Resources Code section 30107.5.[2] The ESHA identification was based on the fact the grove provided the only significant locally available roosting and nesting habitat for birds of prey (raptors) in the Bolsa Chica area. At least 11 species of raptors have been identified as utilizing the site, including the white-tailed kite, marsh hawk, sharp skinned hawk, Cooper's hawk and osprey. According to Commission, a number of the raptors are dependent upon the adjacent lowland wetlands for food and the eucalyptus grove provides an ideal nearby lookout location as well as a refuge and nesting site.

### B. *Section 30240*

Under the Coastal Act, Commission is required to protect the coastal zone's delicately balanced ecosystem. (§§ 30001, subds. (a)-(c), 30001.5, subd. (a); *City of San Diego* v. *California Coastal Com.* (1981) 119 Cal.App.3d 228, 233 [174 Cal.Rptr. 5]; *Sierra Club* v. *California Coastal Com.* (1993) 12 Cal.App.4th 602, 611 [15 Cal.Rptr.2d 779] (*Pygmy Forest*).) Thus in reviewing all programs and projects governed by the Coastal Act, Commission must consider the effect of proposed development on the environment of the coast. (See *City of San Diego* v. *California Coastal Com.,* *supra,* 119 Cal.App.3d at p. 234.)

In terms of the general protection the Coastal Act provides for the coastal environment, we have analogized it to the California Environmental Quality Act (CEQA) (§§ 21000-21174). (*Coastal Southwest Dev. Corp.* v. *California Coastal Zone Conservation Com.* (1976) 55 Cal.App.3d 525, 537 [127 Cal.Rptr. 775].) We have found that under both the Coastal Act and CEQA: " 'The courts are enjoined to construe the statute liberally in light of its beneficient purposes. [Citation.] The highest priority must be given to environmental consideration in interpreting the statute [citation].' " (*Ibid.*)

In addition to the protection afforded by the requirement that Commission consider the environmental impact of all its decisions, the Coastal Act provides heightened protection to ESHA's. (*Pygmy Forest, supra,* 12 Cal.App.4th at p. 611.) Section 30107.5 identifies an ESHA as "any area in which plant or animal life or their habitats are either rare or especially valuable because of their special nature or role in an ecosystem and which could be easily disturbed or degraded by human activities and developments." "The consequences of ESHA status are delineated in section 30240: '(a) Environmentally sensitive habitat areas shall be protected against any

---

[2]All statutory references are to the Public Resources Code unless otherwise indicated.

significant disruption of habitat values, and only uses dependent on those resources shall be allowed within those areas. [¶] (b) Development in areas adjacent to environmentally sensitive habitat areas and parks and recreation areas shall be sited and designed to prevent impacts which would significantly degrade those areas, and shall be compatible with continuance of those habitat and recreation areas.' Thus development in ESHA areas themselves is limited to uses dependent on those resources, and development in adjacent areas must carefully safeguard their preservation." (*Pygmy Forest, supra,* 12 Cal.App.4th at p. 611.)

 Commission found that residential development in the eucalyptus grove was permissible under section 30240 because the LCP required that an alternate raptor habitat be developed on Huntington Mesa. Commission reasoned that section 30240 only requires that "habitat values" be protected and that given the deteriorating condition of the grove, creation of a new raptor habitat on Huntington Mesa was the best way to promote the "habitat values" of the eucalyptus grove.

The reasoning Commission employed is seductive but, in the end, unpersuasive. First, contrary to Koll's argument, we are not required to give great weight to the interpretation of section 30240 set forth by Commission in its findings approving the LCP. The interpretation was not contemporaneous with enactment of section 30240 or the result of any considered official interpretive effort and it did not carry any other of the indicia of reliability which normally requires deference to an administrative interpretation. (See *Yamaha Corp. of America* v. *State Bd. of Equalization, supra,* 19 Cal.4th at pp. 12-13.)

Secondly, the language of section 30240 does not permit a process by which the habitat values of an ESHA can be isolated and then recreated in another location. Rather, a literal reading of the statute protects *the area* of an ESHA from uses which threaten the habitat values which exist in the ESHA. Importantly, while the obvious goal of section 30240 is to protect habitat values, the express terms of the statute do not provide that protection by treating those values as intangibles which can be moved from place to place to suit the needs of development. Rather, the terms of the statute protect habitat values by placing strict limits on the uses which may occur in an ESHA and by carefully controlling the manner uses in the area around the ESHA are developed. (*Pygmy Forest, supra,* 12 Cal.App.4th at p. 611.)

Thirdly, contrary to Commission's reasoning, section 30240 does not permit its restrictions to be ignored based on the threatened or deteriorating

condition of a particular ESHA. We do not doubt that in deciding whether a particular area is an ESHA within the meaning of section 30107.5, Commission may consider, among other matters, its viability. (See *Pygmy Forest, supra,* 12 Cal.App.4th at pp. 614-615.) However, where, as is the case here, Commission has decided that an area is an ESHA, section 30240 does not itself provide Commission power to alter its strict limitations. (12 Cal.App.4th at p. 617.) There is simply no reference in section 30240 which can be interpreted as diminishing the level of protection an ESHA receives based on its viability. Rather, under the statutory scheme, ESHA's, whether they are pristine and growing or fouled and threatened, receive uniform treatment and protection. (See *Pygmy Forest, supra,* 12 Cal.App.4th at p. 617.)

In this regard we agree with the trust that Commission's interpretation of section 30240 would pose a threat to ESHA's. As the trust points out, if, even though an ESHA meets the requirements of section 30107.5, application of section 30240's otherwise strict limitations also depends on the relative viability of an ESHA, developers will be encouraged to find threats and hazards to all ESHA's located in economically inconvenient locations. The pursuit of such hazards would in turn only promote the isolation and transfer of ESHA habitat values to more economically convenient locations. Such a system of isolation and transfer based on economic convenience would of course be completely contrary to the goal of the Coastal Act, which is to protect *all* coastal zone resources and provide heightened protection to ESHA's. (§§ 30001, subds. (a)-(c), 30001.5, subd. (a); *Pygmy Forest, supra,* 12 Cal.App.4th at p. 613.)

. In short, while compromise and balancing in light of existing conditions is appropriate and indeed encouraged under *other* applicable portions of the Coastal Act, the power to balance and compromise conflicting interests cannot be found in section 30240.

## C. *Section 30007.5*

Koll argues that even if transfer of habitat values was not permissible under section 30240, such a transfer was permissible under the provisions of section 30007.5 and our holding in *Batiquitos Lagoon.* Section 30007.5 states: "The Legislature further finds and recognizes that conflicts may occur between one or more policies of the [Coastal Act]. The Legislature therefore declares that in carrying out the provisions of this division such conflicts be resolved in a manner which on balance is the most protective of significant coastal resources. In this context, the Legislature declares that broader

policies which, for example, serve to concentrate development in close proximity to urban and employment centers may be more protective, overall, than specific wildlife habitat and other similar resource policies."

In *Batiquitos Lagoon* we were confronted with "the conflicting interests of fish and fowl." (*Batiquitos Lagoon, supra*, 19 Cal.App.4th at p. 550.) Each interest was protected by a specific provision of the Coastal Act: The fish were protected by section 30230 which directed that marine resources be preserved and, where feasible, restored; the fowl were protected by the requirement of section 30233, subdivision (b), that the very substantial dredging needed to restore the fish habitat avoid significant disruption of the bird habitat. We found that under section 30007.5, Commission could resolve these conflicting policy interests by favoring long-term restoration of the fish habitat over the short-term, but significant, disruption of the bird habitat. (19 Cal.App.4th at p. 562.)

Here, in contrast to the situation in *Batiquitos Lagoon*, the record at this point will not support application of the balancing power provided by section 30007.5. Unlike the record in that case, here our review of the proceedings before Commission does not disclose any policy or interest which directly conflicts with application of section 30240 to the eucalyptus grove. (See *Pygmy Forest, supra*, 12 Cal.App.4th at p. 620.)

Although the Coastal Act itself recognizes the value and need for residential development (see §§ 30001.5, subd. (b), 30007), nothing in the record or the briefs of the parties suggests there is such an acute need for development of residential housing in and around the eucalyptus grove that it cannot be accommodated elsewhere. (Cf. *Pygmy Forest, supra*, 12 Cal.App.4th at p. 620 [no showing residential development needed in ESHA's].) Rather, the only articulated interests which the proposed transfer of the "habitat values" serves is Commission's expressed desire to preserve the raptor habitat values over the long term and Commission's subsidiary interest in replacing non-native eucalyptus with native vegetation. However, as the trust points out, there is no evidence in the record that destruction of the grove is a prerequisite to creation of the proposed Huntington Mesa habitat. In the absence of evidence as to why preservation of the raptor habitat at its current location is unworkable, we cannot reasonably conclude that any genuine conflict between long-term and short-term goals exists.

In sum then the trial court erred in sustaining that portion of the LCP which permitted development of the eucalyptus grove.

# V

## *Lowland Wetlands*[3]

The Coastal Act provides a separate protection regime for wetlands. Under section 30121: " 'Wetland' means lands within the coastal zone which may be covered periodically or permanently with shallow water and include saltwater marshes, freshwater marshes, open or closed brackish water marshes, swamps, mudflats, and fens."

Section 30233, subdivision (a), protects wetlands by providing: "The diking, filling, or dredging of . . . wetlands . . . shall be permitted in accordance with other applicable provisions of this division, where there is no feasible less environmentally damaging alternative, and where feasible mitigation measures have been provided to minimize adverse environmental effects, and shall be limited to the following:

"(1) New or expanded port, energy, and coastal-dependent industrial facilities, including commercial fishing facilities.

"(2) Maintaining existing, or restoring previously dredged, depths in existing navigational channels, turning basins, vessel berthing and mooring areas, and boat launching ramps.

"(3) In wetland areas only, entrance channels for new or expanded boating facilities; and in a degraded wetland, identified by the Department of Fish and Game pursuant to subdivision (b) of Section 30411, for boating facilities if, in conjunction with such boating facilities, a substantial portion of the degraded wetland is restored and maintained as a biologically productive wetland. The size of the wetland area used for boating facilities, including berthing space, turning basins, necessary navigation channels, and any necessary support service facilities shall not exceed 25 percent of the degraded wetland.

"(4) In open coastal waters, other than wetlands, including streams, estuaries, and lakes, new or expanded boating facilities and the placement of structural pilings for public recreational piers that provide public access and recreational opportunities.

---

[3]Commission contends the propriety of the trial court's rulings on the lowland wetlands and the Warner Avenue Pond issues are moot in light of the acquisition of the lowland wetlands by the state and Koll's agreement to limit development on Bolsa Chica Mesa. However, the propriety of the trial court's award of attorney fees depends in part on the propriety of its ruling on these issues, and thus we are required to consider them on the merits. (See *Save Our Residential Environment* v. *City of West Hollywood* (1992) 9 Cal.App.4th 1745, 1751 [12 Cal.Rptr.2d 308].)

"(5) Incidental public service purposes, including, but not limited to, burying cables and pipes or inspection of pier and maintenance of existing and outfall lines.

"(6) Mineral extraction, including sand for restoring beaches, except in environmentally sensitive areas.

"(7) Restoration purposes.

"(8) Nature study, aquaculture, or similar resource-dependent activities."

█ Although section 30233, subdivision (a), permits development of wetland areas when needed as a means of accommodating a whole host of varied uses, residential development is not a use permitted in wetlands. Nonetheless Commission found that residential development of portions of the Bolsa Chica lowlands was permissible, even though it would require destruction of otherwise protected wetlands, because the development would be used to finance needed restoration of other degraded portions of the wetlands.

Commission reasoned that, although section 30233, subdivision (b), does not expressly permit residential development of wetlands, authority for such development can be found in the related provisions of section 30411, subdivision (b). Section 30411, subdivision (b), states: "The Department of Fish and Game, in consultation with the commission and the Department of Boating and Waterways, may study degraded wetlands and identify those which can most feasibly be restored in conjunction with development of a boating facility as provided in subdivision (a) of Section 30233. Any such study shall include consideration of all of the following:

"(1) Whether the wetland is so severely degraded and its natural processes so substantially impaired that it is not capable of recovering and maintaining a high level of biological productivity without major restoration activities.

"(2) Whether a substantial portion of the degraded wetland, but in no event less than 75 percent, can be restored and maintained as a highly productive wetland in conjunction with a boating facilities project.

"(3) Whether restoration of the wetland's natural values, including its biological productivity and wildlife habitat features, can most feasibly be achieved and maintained in conjunction with a boating facility or whether there are other feasible ways to achieve such values."

Commission found that section 30411, subdivision (b)(3), permits wetland restoration to be achieved by way of any means which are more feasible than

development of boating facilities. Because the county had previously found that development of a marina at Bolsa Chica was not feasible, Commission further reasoned that "residential development qualifies as a more feasible method of achieving restoration . . . since the construction and sale of the Lowland residential units would fund the restoration program and allow it to be implemented."

The trial court rejected Commission's reasoning. The trial court stated: "Section 30411 [, subdivision (b),] also does not authorize residential development. Rather, it authorizes the Department of Fish and Game to study and identify which degraded wetlands can feasibly be restored in conjunction with the development of a boating facility. In conducting its study, the Department of Fish and Game must consider whether the restoration of the wetlands' values can be achieved and maintained in conjunction with a boating facility 'or whether there are other feasible ways to achieve such values.' The most logical interpretation of the quoted language, construed in light of the Coastal Act as a whole, requires the Department of Fish and Game to consider whether alternatives less intrusive than developing a boating facility are feasible. The Commission's interpretation would open the door to any type of development in a wetland whenever a finding could be made that funds were otherwise unavailable to restore degraded wetlands." We agree with the trial court.

First, we note the trial court's interpretation comports with the plain meaning of section 30411, subdivision (b), which expressly limits the power of the Department of Fish and Game to the *study* of boating projects authorized by section 30233, subdivision (a). There is nothing on the face of section 30411, subdivision (b), which *authorizes* the development of residential projects in wetland areas or for that matter authorizes any development which is not permitted by section 30233.

Moreover, the alternative analysis required by section 30411, subdivision (b)(3), cannot be read to inferentially permit the development of facilities which are not otherwise permitted by section 30233, subdivision (a). By its terms section 30233, subdivision (a), purports to set forth the purposes, in their entirety, for which coastal wetlands can be developed. If the Legislature intended that residential development of wetlands was to be permitted, logic would suggest that such a use be set forth unambiguously on the face of section 30233, subdivision (a), rather than as an implied power under section 30411, subdivision (b)(3).

Another difficulty with Commission's interpretation of section 30411 is that the power to study the feasibility of boating facilities rests with the

Department of Fish and Game, not Commission. We think it would be somewhat incongruous to provide the Department of Fish and Game with the power to determine, by way of a study, when residential development may occur in a coastal wetland. That power, it would seem, would be more appropriately directly exercised by Commission. Indeed section 30411, subdivision (a), provides, in pertinent part: "The Department of Fish and Game and the Fish and Game Commission are the principal state agencies responsible for *the establishment and control of wildlife and fishery management programs.*" (Italics added.) There is nothing in the Coastal Act or any other provision of law, which suggests the Department of Fish and Game has any expertise with respect to the need for or impacts of residential development in the coastal zone.

We are also unpersuaded by the fact that Commission's interpretation has been set forth in interpretative guidelines it adopted pursuant to authority granted to Commission under section 30620, subdivision (b). (See *California Coastal Com.* v. *Office of Admin. Law* (1989) 210 Cal.App.3d 758, 761-762 [258 Cal.Rptr. 560].) Although, because the guidelines were subject to a formal review and adoption process analogous to the Administrative Procedure Act (Gov. Code, § 11340 et seq.) and for that reason are entitled to great weight (*Coronado Yacht Club* v. *California Coastal Com.* (1993) 13 Cal.App.4th 860, 868 [17 Cal.Rptr.2d 10]), here the guidelines themselves obliquely recognize that Commission's interpretation expands the uses and processes contemplated by sections 30233 and 30411. The guidelines describe a process under which developers, agencies and Commission, rather than the Department of Fish and Game, consider alternatives to boating facilities. Importantly, however, the guidelines concede: "The Coastal Act does not require the Department of Fish and Game to undertake studies which would set the process described in this section in motion. . . . This section is, however, included to describe, clarify, and encourage, public and private agencies to formulate innovative restoration projects to accomplish the legislative goals and objectives described earlier." In light of the express limitation which appears on the face of section 30233 and the express delegation of responsibility to the Department of Fish and Game under section 30411, Commission's admittedly innovative interpretation cannot be sustained.

In short, the trial court's interpretation is supported by the plain language of the statute, the need to give significance to every word and phrase of the statute and the requirement that "statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible." (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) Thus we

find no error in the trial court's finding that residential development of the lowland wetlands was not permitted.

## VI

### *Warner Avenue Pond*

■ The parties agree Warner Avenue Pond, which is located on Bolsa Chica Mesa, is both an ESHA within the meaning of section 30107.5 and a wetland within the meaning of section 30121. As we have noted under section 30240, the habitat values in an ESHA may not be significantly disrupted and no use of an ESHA may occur which is not dependent on resources which exist in the ESHA. As we have also noted under section 30233, subdivision (a), wetlands are protected by specific limitations with respect to uses which may occur in a wetland and by the requirement that there be no feasible less environmentally damaging alternative to diking, filling or dredging of a wetland.

In approving the LCP, Commission found Warner Avenue Pond could be filled to permit the widening of Warner Avenue and that the filling could be mitigated by offsite restoration of other wetlands on a ratio of four to one. Commission found that widening of the road was an "[i]ncidental public service" within the meaning of section 30233, subdivision (a)(5), and therefore a permissible use of the wetland. Commission's findings do not discuss the pond's status as an ESHA.

The trial court found Commission's findings were inadequate. The trial court reasoned that in this instance the protection provided by section 30240 to ESHA's and the development permitted by section 30233, subdivision (a)(5), were conflicting policies within the meaning of section 30007.5 which empowered Commission to resolve such policy conflicts in a manner which is "most protective of coastal resources." (§ 30007.5, *Batiquitos Lagoon, supra,* 19 Cal.App.4th at pp. 562-563.) However the trial court further found that in order to exercise its power under section 30007.5, Commission was required by section 30200, subdivision (b), to make findings which identified and resolved the policy conflict. The trial court concluded Commission's findings did not meet these requirements.

We agree with the trial court that Commission's findings were inadequate with respect to Warner Avenue Pond. However, we reach that conclusion by way of a somewhat different analytical path. In particular, we do not believe the policies embodied in sections 30240 and 30233 are in direct conflict necessitating resort to the power provided by section 30007.5. Rather, in this

instance we agree with Commission's guidelines that the ESHA protections provided by section 30240 are more general provisions and the wetland protections provided by section 30233 are more specific and controlling when a wetland area is also an ESHA. The guidelines state: "The Commission generally considers wetlands, estuaries, streams, riparian habitats, lakes and portions of open coastal waters to be environmentally sensitive habitat areas because of the especially valuable role of these habitat areas in maintaining the natural ecological functioning of many coastal habitat areas and because these areas are easily degraded by human developments. In acting on an application for development [of] one of these areas, the Commission considers all relevant information. The following specific policies apply to these areas: Sections 30230; 30231; 30233; and 30236. Section 30240, a more general policy, also applies, but the more specific language in the former sections is controlling where conflicts exist with general provisions of Section 30240 (e.g., port facilities may be permitted in wetlands under Section 30233 even though they may not be resource dependent). This guideline addresses wet environmentally sensitive habitat areas only. The discussion in this section and in section VII is not intended to describe or include all environmentally sensitive habitat areas which may fall under Section 30240 of the Coastal Act."

The guidelines go on to provide: "Of all the environmentally sensitive habitat areas mentioned specifically in the Coastal Act, wetlands and estuaries are afforded the most stringent protection. In order to approve a project involving the diking, filling, or dredging of a wetland or estuary, the Commission must first find that the project is one of the specific, enumerated uses set forth in Section 30233 of the Act (these developments and activities are listed in section A. and B. below). The Commission must then find that the project meets all three requirements of Section 30233 of the Act (see pp. 14-17). In addition, permitted development in these areas must meet the requirements of other applicable provisions of the Coastal Act.

"A. *Developments and Activities Permitted in Wetlands and Estuaries*

"1. Port facilities.

". . . . . . . . . . . . . . . . . . . . . . . .

"5. Incidental public service purposes *which temporarily impact the resources of the area,* which include, but are not limited to, burying cables and pipes, inspection of piers, and maintenance of existing intake and outfall lines *(roads do not qualify)*." (Italics added, fns. omitted.)

Significantly, by way of a footnote Commission explains that "incidental services" may include, under certain circumstances, road expansion: "When

no other alternative exists, and when consistent with the other provisions of this section, limited expansion of roadbeds and bridges necessary to maintain existing traffic capacity may be permitted."

We agree with these aspects of Commission's guidelines. We note Commission's determination that section 30233, subdivision (a), was meant to supplant the provisions of section 30240 is supported by section 30233, subdivision (a)(6), which permits mineral development in wetlands *except in environmentally sensitive areas.*" (Italics added.) Because none of the other permitted wetland uses set forth in section 30233, subdivision (a), have such an express exception for ESHA's, the inference arises that had the drafters intended the uses permitted by section 30233, subdivision (a), to be subject to ESHA protection, they would have made their intention explicit.

In addition to the inferential support found by reference to section 30233, subdivision (a)(6), Commission's interpretation is also supported by a broader view of the statutory scheme. Wetland ESHA's are unique in that although like all ESHA's they need extraordinary protection, there are important activities such as fishing, boating, shipbuilding and other commercial and industrial activities which of necessity may occur on or near wetland areas. Importantly, the value of such activities is specifically recognized by the act and Commission is empowered to permit them to occur notwithstanding their adverse impact on coastal resources. (See §§ 30001.2, 30708.)

The activities which may occur in wetland areas are, as Commission noted, set forth with great specificity and detailed limitation in section 30233, subdivision (a). Such specificity and detail does not occur either in the general provisions accommodating industrial and commercial uses (see §§ 30001.2, 30708) or in the limitation on ESHA development set forth in section 30240. Given that section 30233, subdivision (a), provides specific and detailed limitation on the uses permitted in wetland areas, we believe it was reasonable for Commission to conclude that with respect to wetland ESHA's, section 30233, subdivision (a), is a more specific guideline for what may occur in a wetland ESHA than either the accommodation of development expressed in sections 30001.2 and 30708 or the more general limitation set forth in section 30240.

Practicality, as well as the need to maintain a consistent level of wetland protection, suggests that development of wetland ESHA's is governed by the very specific and uniform limitations set forth in section 30233, subdivision (a), rather than by way of the essentially ad hoc balancing process permitted by section 30007.5. Given the myriad of wetland areas which exist in the coastal zone and the inherent conflict between the permissive policy expressed in sections 30001.2 and 30708 and the restrictive policy of section

30240, in the absence of the limitation set forth in section 30233, subdivision (a), case-by-case balancing of interests under section 30007.5 would be repeatedly required.

Although we accept Commission's interpretation of sections 30233 and 30240, we do not accept Commission's application of that interpretation to Warner Avenue Pond. In particular we note that under Commission's interpretation, incidental public services are limited to temporary disruptions and do not usually include permanent roadway expansions. Roadway expansions are permitted only when no other alternative exists and the expansion is necessary to maintain existing traffic capacity. As the trust points out, Commission found that the widening of Warner Avenue was needed to accommodate future traffic created by local and regional development in the area. Contrary to Koll's argument, this limited exception cannot be extended by finding that a roadway expansion is permissible when, although it increases the vehicle capacity of a roadway, it is designed to maintain an existing level of traffic service. Such an interpretation of the exception would entirely consume the limitation Commission has put on the incidental public services otherwise permitted by section 30233, subdivision (a)(2).

In sum then, like the trial court we find that the LCP is defective insofar as it approves the filling of Warner Avenue Pond.

## VII

### *Attorney Fees*

The trial court awarded the trust its attorney fees under the provisions of Code of Civil Procedure section 1021.5 and divided those fees among Koll, Fieldstone and the state. Those parties do not challenge the amount of fees awarded but the propriety of any award in the context of a dispute over adoption of an LCP.

For their part, Koll and Fieldstone contend that it is improper and indeed unconstitutional to award fees where Commission, not they, was found to have made inadequate findings. This argument is, frankly, somewhat disingenuous. Both Koll and Fieldstone vigorously defended Commission's findings both in the trial court and do so again on appeal. Indeed, the vigor of their defense of Commission's findings was so great that they *opposed* Commission's efforts to have the matter remanded so that it could make new findings. It suffices to say the vigor of Koll and Fieldstone's defense no doubt compelled the trust to incur substantial attorney fees and accordingly make it fair under the equitable principles embodied in Code of Civil

Procedure section 1021.5 to impose some of those costs on Koll and Fieldstone. (See *San Bernardino Valley Audobon Society, Inc.* v. *County of San Bernardino* (1984) 155 Cal.App.3d 738, 755-757 [202 Cal.Rptr. 423]; *Serrano* v. *Priest* (1977) 20 Cal.3d 25, 42-47 [141 Cal.Rptr. 315, 569 P.2d 1303].)

Commission argues the trial court abused its discretion in awarding attorney fees against it because it believes a great deal of the expense the trust incurred could have been avoided if the trust had agreed to Commission's effort in the trial court to remand the wetlands issues in light of the state's acquisition of Koll's lowland holdings. This argument presupposes that the trust's opposition to the remand would have persuaded the trial court to remand the matter even in light of Koll and Fieldstone's separate opposition to the remand. Because the trial court both denied the remand and awarded the attorney fees, we must conclude that it did not believe the trust's position with respect to the remand compelled the trust to incur unnecessary fees.

Finally, Commission contends that the imposition of attorney fees has imposed an undue hardship on it. As the trust points out, this is not a factor which courts are required to consider in awarding attorney fees against a public agency. (See *San Bernardino Valley Audobon Society, Inc.* v. *County of San Bernardino, supra*, 155 Cal.App.3d at p. 755, fn. 2.) Rather, this is a concern Commission should more properly address to the Legislature in either securing an appropriation to relieve the hardship or in obtaining an amendment to Code of Civil Procedure section 1021.5 which would require that trial courts consider the impact on the operations of public agencies before imposing fees on them.

### DISPOSITION

The trust's petition is granted in part and the superior court is directed to grant the trust's administrative mandamus petition with respect to the eucalyptus grove; in all other respects, the parties' petitions are denied. Trust to recover its costs.

Work, Acting P. J., and Huffman, J., concurred.