133 Cal.Rptr.2d 182 (2003)
107 Cal.App.4th 1030
SIERRA CLUB et al., Plaintiffs and Appellants,
v.
CALIFORNIA COASTAL COMMISSION, Defendant and Respondent;
Catellus Residential Group, Real Party in Interest and Respondent.
No. A100194.
Court of Appeal, First District, Division Five.
April 11, 2003.
As Modified on Denial of Rehearing May 9, 2003.
Review Granted July 23, 2003.
*185 Law Offices of Frank P. Angel, Frank P. Angel, Los Angeles, Curtis M. Horton, for appellants.
*186 Bill Lockyer, Attorney General, J. Matthew Patterson, Senior Assistant Attorney General, Jamee Jordan Patterson, Supervising Deputy Attorney General, Hayley Peterson, Deputy Attorney General, for respondent California Coastal Commission.
Latham & Watkins, Robert D. Crockett, Kathryn M. Davis, James R. Repking, Los Angeles, for real party in interest and respondent Catellus Residential Group.
Certified for Partial Publication.[*].
GEMELLO, J.
May the California Coastal Commission (Commission) consider the environmental impacts of development outside the coastal zone when approving a project that straddles the coastal zone boundary? We hold that it may not, and that the Commission acted correctly when it confined its analysis of a project to the environmental impacts of the portion lying inside the coastal zone.
At issue in this case is a 114-home housing project proposed to be built on a Los Angeles bluff near the Pacific Ocean. Because a portion of the project lies inside the coastal zone and under the jurisdiction of the Commission, the developer was required to seek a Commission coastal development permit. The Commission rejected an earlier version of the project, but approved the project after the developer made modifications to alleviate many of the Commission's concerns.
The Sierra Club disagreed with the Commission's decision and sought review by a petition for writ of mandate. The trial court denied relief. Having carefully reviewed the record, we agree with the trial court. The Commission's decision is supported by substantial evidence and was arrived at in compliance with both the California Coastal Act and California Environmental Quality Act. We further hold that the Commission is barred by statute from considering the impacts of those portions of a project outside the coastal zone; that the Commission can consider the condition of a wildlife habitat in determining whether it is an Environmentally Sensitive Habitat Area (ESHA); and that the promise of a developer to create an ESHA in the future does not subject that area to ESHA protections beforehand. We affirm.
Factual and Procedural Background
Respondent and real party in interest Catellus Residential Group (Catellus) owns a 44.69-acre parcel of property located in the Westchester-Playa del Rey area of Los Angeles. The property is located about a mile from the ocean. It consists of a broad, gently sloping bluff top that leads to moderate to steep slopes, which descend on the northerly and westerly boundaries to the property line. The bluff face, but not the bluff top, falls in the coastal zone and is therefore subject to the Commission's jurisdiction. (See Pub. Resources Code, § 30103.) The site is adjacent to Lincoln Boulevard (State Highway 1) on the east and an existing residential neighborhood to the south.
Another developer sought to develop the parcel in the early 1990's. In 1993, the City of Los Angeles (City) prepared an environmental impact report (EIR) in connection with that project, but the developer abandoned the project before obtaining any permits.
Catellus thereafter acquired the property. Initially, Catellus proposed a development with 119 single-family homes (the Project). Because a portion of the Project was located in the coastal zone, Catellus was obliged to obtain permits from both the City and the Commission. (See Pub. Resources Code, §§ 30600, subd. (a), 30601; Cal.Code Regs., tit. 14, § 13307.) Catellus applied for the required permits. *187 The City prepared a second EIR and issued a coastal development permit.
The Sierra Club appealed the City's decision to issue a coastal development permit to the Commission, which has jurisdiction to review such decisions. (Pub. Resources Code, § 30625, subd. (a).) In August 1999, the Commission reviewed the applications for City and Commission coastal development permits and rejected them. It cited concerns about excessive grading, landform alteration, and the impact on coastal views. One source of concern was Catellus's plan to fill Hastings Canyon, on the westernmost coastal edge of the property.
Catellus revised the Project. It reduced the number of homes to 114. It removed or buried retaining walls along the bluff face. It eliminated coastal zone filling of Hastings Canyon. It expanded the amount of revegetation of coastal scrub. It agreed to purchase 15 lots along the bluff face, adjacent to the property, and retire its development rights, thus limiting future development along the bluff face. The revised Project retained key aspects of the original Project, including construction of a public-access view park along the bluff rim and confinement of residential development to the bluff top, outside the coastal zone. Catellus then applied for new permits.
The City prepared a supplement to its second EIR and again concluded that the Project would not have significant environmental impacts. It issued a new coastal development permit on January 28, 2000. Once again, Sierra Club appealed to the Commission.
The Commission staff prepared a report addressing the appeal on the City permit and Catellus's renewed application for a Commission permit. It recommended approval of both permits, with one major condition: that the Project be modified to eliminate "Street A," a proposed road leading up the bluff face that would connect the Project to Lincoln Boulevard. Catellus had designed the Project so that 29 of the 114 homeowners could reach their property through existing city streets. However, the remaining 85 homeowners would travel to their property via Street A. Street A would be approximately 50 to 60 feet wide and 480 feet long. It would extend from Lincoln Boulevard, up through the bluff face, to the bluff top, where it would connect to a series of culde-sacs. To construct the road, Catellus proposed to grade approximately 54,000 cubic yards of soil. About half of Street A would be located in the coastal zone.
The Commission held a consolidated public hearing on the two permits on August 7, 2000. After hearing evidence in favor of and against the Project, the Commission voted seven to four to amend the staff Project description to eliminate the "No Street A" condition proposed by the Commission staff. It then voted nine to two to approve both permits for the Project. Because the commissioners rejected the staff recommendation, and implicitly, the staff report embodying that recommendation, the commissioners did not adopt written findings to explain their decision at the August 7 hearing. Instead, the staff prepared revised findings reflecting the Commission's actions. The Commission considered the proposed revised findings and approved them on December 11, 2000.
On October 6, 2000, appellants Sierra Club, Spirit of the Sage Council, and Ballona Ecosystem Education Project (collectively Sierra Club) filed a petition for writ of administrative mandate in San Francisco Superior Court challenging the Commission's decision to grant the permits and allow development. The petition named as *188 defendants the Coastal Commission, Catellus, and the City.[1]
The Sierra Club applied for a preliminary injunction, asking the court to enjoin Catellus from conducting any grading on the property pending resolution of its suit. The trial court denied the request. On appeal, we reversed. In an unpublished opinion, we concluded that the trial court abused its discretion in denying a preliminary injunction because the absence of written findings in the then existing trial court record made it impossible to evaluate the legality of the Commission's actions.
After the case returned to the trial court, the parties proceeded to a hearing on the merits. With the Commission's December 11, 2000, written findings now part of the record, the trial court denied the Sierra Club's petition on all grounds. It entered its statement of decision and judgment on July 23, 2002.
The Sierra Club timely appealed. We subsequently granted a writ of supersedeas staying the trial court's judgment until we had had an opportunity to rule on the merits of the appeal.

Discussion

I. Standard of Review

The Sierra Club challenges the Commission's actions through a petition for writ of mandate under Code of Civil Procedure section 1094.5. (See Pub. Resources Code, § 30801 [authorizing any "aggrieved person" to seek judicial review of Commission decisions].) Code of Civil Procedure section 1094.5 imposes a deferential standard of review; unless the Commission has exceeded its jurisdiction or denied a fair hearing, the trial court may only reverse if it finds a prejudicial abuse of discretion. (Code Civ. Proc., § 1094.5, subd. (b).) "Abuse of discretion is established if the [Coastal Commission did not] proceed[ ] in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b).) "Where it is claimed that the findings are not supported by the evidence ..., abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record." (Code Civ. Proc., § 1094.5, subd. (c).)
"The substantial evidence rule requires the trial court to start with the presumption that the record contains evidence to sustain every finding of fact. [Citation.] The burden is upon the appellant to show there is no substantial evidence whatsoever to support the findings. [Citation.] The trier of fact ... is the sole arbiter of all conflicts in the evidence, conflicting interpretations thereof, and conflicting inferences which reasonably may be drawn therefrom; it is the sole judge of the credibility of the witnesses [and] may disbelieve them even though they are uncontradicted if there is any rational ground for doing so...." (Pescosolido v. Smith (1983) 142 Cal.App.3d 964, 970-971, 191 Cal.Rptr. 415.) The court must consider all relevant evidence, including evidence that detracts from the decision. (Sierra Club v. California Coastal Com. (1993) 12 Cal.App.4th 602, West's Ann.Cal.Evid.Code § 610, 15 Cal.Rptr.2d 779 (Pygmy Forest).) Ultimately, however, "`[i]t is for the agency to weigh the preponderance of *189 conflicting evidence [citation]. Courts may reverse an agency's decision only if, based on the evidence before the agency, a reasonable person could not reach the conclusion reached by the agency.'" (Ibid., italics omitted.)
Our function on appeal is the same as that of the trial court. We review the administrative decision to determine whether it is supported by substantial evidence. (City of San Diego v. California Coastal Com. (1981) 119 Cal.App.3d 228, 232, 174 Cal.Rptr. 5; Lewin v. St. Joseph Hospital of Orange (1978) 82 Cal.App.3d 368, 386, 146 Cal.Rptr. 892.) As to questions of law, we perform "essentially the same function" in reviewing administrative mandate proceedings as the trial court, and "the conclusions [of law] of the trial court are not conclusive on appeal." (Lewin v. St. Joseph Hospital of Orange, at p. 387,146 Cal.Rptr. 892.)

II. The Commission's Decision Complies with the Coastal Act

A. The Coastal Act

The California Coastal Act of 1976, Public Resources Code sections 30000-30950[2] (Coastal Act or Act), "was enacted by the Legislature as a comprehensive scheme to govern land use planning for the entire coastal zone of California. The Legislature found that `the California coastal zone is a distinct and valuable natural resource of vital and enduring interest to all the people'; that `the permanent protection of the state's natural and scenic resources is a paramount concern'; that `it is necessary to protect the ecological balance of the coastal zone' and that `existing developed uses, and future developments that are carefully planned and developed consistent with the policies of this division, are essential to the economic and social well-being of the people of this state....'" (Yost v. Thomas (1984) 36 Cal.3d 561, 565, 205 Cal.Rptr. 801, 685 P.2d 1152 (Yost), quoting § 30001, subds. (a)-(d).)
The Act creates a coordinated system of land use regulation for the entire coastal zone of the state. (See § 30103.) The Act's "cardinal requirement" (California Coastal Com. v. Quanta Investment Corp. (1980) 113 Cal.App.3d 579, 587-588, 170 Cal.Rptr. 263), and its central enforcement mechanism, is the requirement that any person who seeks to undertake a development within the coastal zone must first obtain a coastal development permit. (§ 30600, subd. (a).) The Act requires two sets of approvals. A developer must seek approval from the local government with jurisdiction over the area to be developed, subject to appeal to and review by the Commission, and must also seek a permit from the Commission itself. (§§ 30600-30601, 30625.)
In deciding whether to issue a permit or approve a permit already issued by the local government, the Commission must evaluate the proposed development for consistency with the policies of the Coastal Act. (§ 30200.) The Sierra Club contends that the Commission breached this duty in three ways: by ignoring inconsistencies between the Project and view preservation policies, by ignoring inconsistencies between the Project and habitat preservation policies, and by failing to issue written findings supporting its decision in the manner required by law. We consider each contention in turn.

*190 B. The Project Is Consistent with Coastal Act View Policies[**]

C. The Commission's Decision Complies with Coastal Policies Governing ESHA's

The Sierra Club argues that the record does not support the finding that the Project is consistent with section 30240, which calls for the protection of ESHAs. Section 30240 requires that ESHAs be protected against habitat disruption, and requires development in adjacent areas to be designed to prevent degradation of the habitat and compatible with continuance of the habitat area. We conclude that the Commission did not err.

1. Substantial Evidence Supports the Conclusion That the Project Will Not Significantly Affect Any ESHA

An ESHA is "any area in which plant or animal life or their habitats are either rare or especially valuable because of their special nature or role in an ecosystem and which could be easily disturbed or degraded by human activities and developments." (§ 30107.5.) The Commission found that the Project area was not an ESHA. Substantial evidence supports that finding.
The Commission relied in part on the City's 1998 EIR, which analyzed in depth the plant and animal habitat resources in the area. The EIR concluded, "The project site generally contains very low habitat resource values and none of the sensitive species found in the adjacent Ballona Wetlands are dependent on resources found exclusively on the project site.... [T]he scattered patches of coastal sage scrub do not represent sufficient habitat to support the wildlife typically found in this habitat type.... Those mammals observed on-site are comprised of common and relatively disturbance-tolerant species and no sensitive species were observed or are expected." The EIR reviewed several surveys of the Project area conducted in 1989-90 and updated in 1997 and found no sensitive mammals, birds, reptiles, or invertebrates present. It concluded that the Project would not have significant environmental habitat impacts.
As the Sierra Club correctly points out, the EIR identifies one significant plant species on the siteDiegan sage scrub. To qualify as an ESHA, an area must contain habitat that is "rare or especially valuable." (§ 30107.5.) The Department of Fish and Game concluded 20 years ago that the habitat was not especially valuable, because development outside the coastal zone and outside the control of the Commission would make it impossible to manage the habitat as an ESHA. A 1989-90 field survey found limited habitat value because of low soil nutrient content, erosion and habitat disturbance. The City EIR confirmed that by 1997, only isolated stands of scrub were left, and they were disturbed by ongoing disking of the bluff top, outside the coastal zone. The Commission's biologist concluded that no ESHA existed because the sage scrub habitat on the site is scattered, severely degraded, and therefore of little value. A Catellus biologist agreed. Based on this evidence, the Commission could conclude that no ESHA existed.
The Sierra Club contends that the Commission could not consider the condition of the habitat in determining whether it was especially valuable, and thus an ESHA. We cannot reconcile this view with the plain language of section 30107.5 or with Bolsa Chica Land Trust v. Superior Court (1999) 71 Cal.App.4th 493, 83 Cal. Rptr.2d 850 (Bolsa Chica). Section *191 30107.5 and section 30240 are intended to ensure preservation of "rare or especially valuable habitat" from degradation. (§ 30107.5.) If habitat has been degraded already and is not viable, there is nothing left to protect, and preservation of unviable habitat will do little to promote the policies underlying the Coastal Act. Bolsa Chica recognizes this point explicitly: "We do not doubt that in deciding whether a particular area is an ESHA within the meaning of section 30107.5, [the] Commission may consider, among other matters, its viability." (Bolsa Chica, supra, 71 Cal. App.4th at p. 508, 83 Cal.Rptr.2d 850.) The Department of Fish and Game concluded in 1984 that the sage scrub habitat on the bluff face, positioned as it was near existing and probable development, would not be viable. Reevaluating the habitat in 2000, the Commission could consider the evidence showing that the existing habitat was not viable and of little value and find that the habitat was not an ESHA.
The Sierra Club disregards the recommendations of the Commission and Catellus biologists and the survey contained in the EIR and instead points to other evidence in the record that it contends shows the Project area is an ESHA, relying primarily on its expert, Dr. Travis Longcore. The Sierra Club's evidence on this point establishes only that reasonable minds might differ. For purposes of our review, the existence of contrary or conflicting evidence, or inferences therefrom, does not preclude our conclusion that, in light of the whole record, other evidence supports the findings that the Commission did adopt. (Pygmy Forest, supra, 12 Cal. App.4th at p. 610, 15 Cal.Rptr.2d 779.)

2. ESHA Protections Do Not Apply to Areas Which Are Not Now ESHAs

The Sierra Club contends further that the Project is inconsistent with the Coastal Act's habitat protection requirements because Catellus's revegetation of the bluff face will create an ESHA in the future. The Sierra Club argues that the Coastal Act's language and underlying intent require planned future ESHAs to be subject to ESHA protections in the present. This is an issue of first impression. We conclude that both the language and intent of the Coastal Act dictate the opposite conclusion: ESHA protections do not apply unless an area is currently an ESHA.
Under section 30240, "[environmentally sensitive habitat areas shall be protected against any significant disruption of habitat values, and only uses dependent on those resources shall be allowed within those areas." (§ 30240, subd. (a).) Under the plain meaning of this provision, environmental protections flow from recognition that an area is currently an ESHA. Nothing in the statute suggests that these protections should apply before an area becomes an ESHA, or should continue to apply if it is no longer an ESHA.
Accepting the Sierra Club's invitation to consider the underlying purposes of the Coastal Act, we reach the same conclusion. Catellus's restoration of habitat along the bluff face is an environmental benefit, and is consistent with the Coastal Act's goal of protecting coastal environmental resources. (§ 30240.) It creates valuable habitat where none now exists. If we were to adopt the Sierra Club's interpretation, we would create disincentives for any future developer to engage in habitat restoration as part of a development. We decline to interpret section 30240 in this manner.
Consequently, nothing in the Commission's approval of the Project is inconsistent with these protections. The bluff face is not now an ESHA. The Commission can *192 authorize development along the bluff face without violating section 30240, subdivision (a). Catellus may construct Street A, and then restore the surrounding areas. If its restoration results in creation of an ESHA, only then will the protections of section 30240 apply.

3. The Commission Does Not Have Jurisdiction to Consider the Impact of Development Outside the Coastal Zone

Finally, the Sierra Club argues that the Commission failed to consider the impact of the Project on adjacent ESHAs. We conclude that the Commission gave sufficient consideration to the impact of those portions of the Project subject to its jurisdiction.
Section 30240, subdivision (b) provides: "Development in areas adjacent to environmentally sensitive habitat areas ... shall be sited and designed to prevent impacts which would significantly degrade those areas, and shall be compatible with the continuance of those habitat ... areas." The Project is adjacent to the Ballona wetlands, an ESHA inside the coastal zone. The EIR and Commission staff considered the impact of the development inside the coastal zone, Street A, on the Ballona wetlands and determined that that development would not be incompatible with and would not significantly degrade the wetlands. The Commission considered these reports and concluded that approval of development in the coastal zone was consistent with section 30240, subdivision (b). The reports constitute substantial evidence sufficient to support the Commission's decision.
However, the Sierra Club contends that the Commission erred as a matter of law by failing to consider the impact of the portion of the Project outside the coastal zone on the Ballona wetlands. According to the Sierra Club, because development inside the coastal zone (Street A) will support development outside the coastal zone (housing atop the bluff), the Commission has jurisdictionand, indeed, is statutorily obligatedto consider and reject the development inside the coastal zone because that portion of the project outside the coastal zone impacts an ESHA.
The Sierra Club's argument raises a previously unresolved issue. When a project straddles the coastal zone border, does the Commission have jurisdiction to evaluate the impacts emanating from the portion of the project outside the coastal zone before issuing a coastal development permit? For the reasons that follow, we hold that it does not. The Commission may not consider the environmental impacts of development outside the coastal zone when deciding whether to approve development inside the coastal zone.
As both sides agree, resolution of this issue hinges on the construction of a pair of statutes, section 30200 and section 30604, subdivision (d). Section 30200 provides in relevant part, "All public agencies carrying out or supporting activities outside the coastal zone that could have a direct impact on resources within the coastal zone shall consider the effect of such actions on coastal zone resources in order to assure that [the policies of the Coastal Act] are achieved." According to the Sierra Club, the portion of the Project inside the coastal zone will "support" the portion of the Project outside the coastal zone; therefore, the Commission must base its permit decision on the effect of out-of-zone portions of the Project. In other words, the Sierra Club argues that notwithstanding the fact that only a portion of Street A is within the coastal zone, the Commission must consider the impact of the entire expanse of Street A and the housing development because that portion *193 of Street A that is within the coastal zone supports or enables the Project.
However, section 30604, subdivision (d) provides: "No development or any portion thereof which is outside the coastal zone shall be subject to the coastal development permit requirements of this division, nor shall anything in this division authorize the denial of a coastal permit by the commission on the grounds the proposed development within the coastal zone will have an adverse environmental effect outside the coastal zone." According to the Commission, under section 30604, subdivision (d), the portion of the Project outside the coastal zone is exempt from Commission regulatory authority, including any authority to consider that portion's adverse impacts inside the coastal zone.
In interpreting section 30604, subdivision (d), the legislative history is instructive. Until 1978, section 30604, subdivision (d) read as follows: "Nothing in this division shall authorize denial of a coastal development permit on grounds that a portion of the proposed development not within the coastal zone will have adverse environmental impacts outside the coastal zone; provided however, that the portion of the proposed development within the coastal zone shall meet the requirements of this chapter." This former version of section 30604, subdivision (d) addressed only the two simplest scenarios. Under former section 30604, subdivision (d), impacts outside the zone from development outside the zone could not be considered, while impacts inside the zone from development inside the zone had to be considered. As for the two more complicated scenariosimpacts inside the zone from development outside the zone, and impacts outside the zone from development inside the zoneformer section 30604, subdivision (d) was silent or at best ambiguous.
In 1978, the Legislature addressed this ambiguity and amended section 30604, subdivision (d) to clarify the scope of the Commission's jurisdiction over development that raised either of these two more complicated scenarios. The second clause of section 30604, subdivision (d) now expressly addresses impacts outside the zone from development inside the zone: "[Nothing] in this division [shall] authorize the denial of a coastal permit by the commission on the grounds the proposed development within the coastal zone will have an adverse environmental effect outside the coastal zone." Thus, the Legislature elected not to extend jurisdiction over such effects to the Commission. In turn, the first clause of section 30604, subdivision (d) addresses development outside the coastal zone: "No development or any portion thereof which is outside the coastal zone shall be subject to the coastal development permit requirements of this division...." For these portions of a development, the Commission has no jurisdiction to require permits.
The legislative history illuminates the intent behind the 1978 amendment. The Senate Natural Resources and Wildlife Committee summary of Senate Bill No. 1873, which amended section 30604, subdivision (d), explained that the amendment was intended to resolve doubts over treatment of parcels straddling the coastal zone boundary. It cited an Attorney General opinion letter that concluded that if the coastal zone bisected a parcel, the Commission could look at the entire parcel in making its permitting decision.[4] The proposed *194 amendment rejected that position. (Sen. Com. on Natural Resources and Wildlife, Analysis of Sen. Bill No. 1873 (1977-1978 Reg. Sess.) as introduced March 22, 1978, p. 3.) As the Assembly Resources, Land Use and Energy Committee summary similarly explained, the measure was needed to "clarify that when a development project is partially within and partially without the coastal zone, only that portion of the project within the coastal zone is subject to commission jurisdiction ...." (Assem. Com. on Resources, Land Use and Energy, Analysis of Sen. Bill No. 1873 (1977-1978 Reg. Sess.) as amended August 7, 1978, p. 3; see also California Coastal Commission, Enrolled Bill Rep. on Sen. Bill No. 1873 (1977-1978 Reg. Sess.) Sept. 13, 1978, p. 2 [amendment "makes clear the Coastal Commissions have no jurisdiction over portions of projects lying outside the coastal zone"].)
The history confirms that the Legislature intended to reject the notion that Commission jurisdiction over part of a project could be leveraged into jurisdiction over the entire project. If the Commission has no jurisdiction over the portion of a project outside the coastal zone, it follows that the Commission has no jurisdiction to evaluate that portion of the project to determine whether its effects are consistent with Coastal Act policies. Furthermore, if the Commission cannot make findings that the portion of a project outside the coastal zone is inconsistent with Coastal Act policies, it cannot use any such findings as a basis for denying a permit for the portion of the project inside the coastal zone. Thus, we conclude that the first clause of section 30604, subdivision (d) prevents the Commission from denying in-zone permits based on environmental impacts originating outside the coastal zone. In this case, the Commission cannot deny the permit for that portion of Street A within the coastal zone based on the environmental effects of the 114 houses outside the zone.
The Sierra Club argues that the first clause of section 30604, subdivision (d) only limits the Commission's permitting jurisdiction, and does not preclude the Commission from considering the effects of development outside the coastal zone. The Sierra Club further contends that the Commission is required to consider these effects under section 30200, because its permit approval of Street A supports the building of homes along the bluff top, outside the coastal zone, and the Commission should refuse a permit for Street A if those homes would have adverse environmental impacts. (See § 30200 ["All public agencies carrying out or supporting activities outside the coastal zone that could have a direct impact on resources within the coastal zone shall consider the effect of such actions on coastal zone resources in order to assure that [the policies of the Coastal Act] are achieved."].)
The argument does not withstand scrutiny because it founders on a logical inconsistency. If, on the one hand, the construction of Street A is unrelated to the building of homes on the bluff top, then the construction of Street A cannot be said to support development outside the coastal zone under section 30200. There would be no nexus between the decision to deny a permit for Street A and the goal of reducing environmental impacts from an entirely unrelated portion of the Project. If, on the other hand, the building of Street A is essential to the construction of homes on the bluff top, such that without Street A some smaller number of homes would have to be built, then the Commission would be able to ensure a reduced development on the bluff top, outside the coastal zone, by denying a permit for Street A. But this is precisely what the 1978 amendments to *195 section 30604, subdivision (d) sought to prevent when they placed all portions of projects outside the coastal zone beyond the reach of Commission jurisdiction. We decline to interpret section 30604, subdivision (d) and section 30200 so as to allow the Commission to accomplish through the back door what the Legislature has told it it may not accomplish through the front door.[5]
The Sierra Club argues that such an interpretation of section 30604, subdivision (d) would work an impermissible implied repeal of section 30200. "`[T]he law shuns repeals by implication ....' [Citation.] ... Thus, to avoid repeals by implication `we are bound to harmonize ... provisions' that are claimed to stand in conflict." (Kennedy Wholesale, Inc. v. State Bd. of Equalization (1991) 53 Cal.3d 245, 249-250, 279 Cal.Rptr. 325, 806 P.2d 1360.) However, this argument hinges on a misapplication of the doctrine disfavoring implied repeals. The doctrine provides that "`where two statutes treat the same subject, one being special and the other general, unless they are irreconcilably inconsistent, the latter, although latest in date, will not be held to have repealed the former, but the special act will prevail in its application to the subject matter as far as coming within its particular provisions....'" (Wolfe v. Dublin Unified School Dist. (1997) 56 Cal.App.4th 126, 135, 65 Cal.Rptr.2d 280.) It applies when a later general statute follows an earlier specific statute. Here, however, the Legislature passed a later specific statute, the amended version of section 30604, subdivision (d), two years after an earlier general statute, section 30200.
Instead, we apply the following canons of construction in reaching our interpretation. A more recent provision is typically more persuasive than an older one. (See Schmidt v. Superior Court (1989) 48 Cal.3d 370, 383, 256 Cal.Rptr. 750, 769 P.2d 932; Schmidt v. Southern Cal. Rapid Transit Dist. (1993) 14 Cal. App.4th 23, 27, 17 Cal.Rptr.2d 340.) Section 30604, subdivision (d) is the more recent provision. We give effect to a specific statute relating to a particular subject in preference to a general statute. (Murillo v. Fleetwood Enterprises, Inc. (1998) 17 Cal.4th 985, 992, 73 Cal.Rptr.2d 682, 953 P.2d 858.) Section 30604, subdivision (d) deals specifically with the geographic scope of the Commission's jurisdiction in issuing permits for projects that straddle the coastal zone; section 30200 deals generally with any agency's actions, and does not define the phrases "supporting activities," which on its face may or may not extend to the issuance of permits inside the coastal zone. Whenever possible we seek "to achieve harmony between conflicting laws [citation] and avoid an interpretation which would require that one statute be ignored." (Schmidt v. Southern Cal. Rapid Transit Dist, supra, 14 Cal.App.4th at p. 27, 17 Cal.Rptr.2d 340; see Broughton v. Cigna Healthplans (1999) 21 Cal.4th 1066, 1086, 90 Cal.Rptr.2d 334, 988 P.2d 67["[O]ur duty is to harmonize [statutes] if reasonably possible"].) We cannot adopt the Sierra Club's interpretation of section 30200 without largely ignoring section 30604, subdivision (d). The reverse does not hold true; if we interpret section 30604, subdivision (d) as governing the Commission's jurisdiction, section 30200 *196 still controls the responsibility of other agencies (such as the City) to consider the impact of their actions (such as approval of development on the bluff top) on coastal resources.
The Sierra Club also turns to the federal Coastal Zone Management Act (CZMA), in support of its interpretation of section 30604, subdivision (d). (16 U.S.C. §§ 1451-1465.) Under the CZMA, an entity conducting an activity that affects coastal zone resources must seek a federal permit, and must include in its application a certification that its activity complies with state coastal zone policies. (16 U.S.C. § 1456, subd. (C)(3)(A).) The state's coastal agency must notify the federal permitting agency (here, the Army Corps of Engineers) whether it concurs in the certification. (Ibid.) Catellus sought and obtained such a permit here. According to the Sierra Club, the CZMA expands the Commission's jurisdiction and authorizes it to review all aspects of the Project, whether inside or outside the coastal zone.
We need not address the thorny federalism questions raised by the Sierra Club's contention. The Sierra Club has not challenged the Army Corps of Engineers' decision to issue Catellus a permit, nor has it challenged the Commission's role in the issuance of that permit. The only issue before us is whether the Commission acted properly in issuing state development permits. With respect to those permits, we believe the Legislature expressed its intent when it amended section 30604, subdivision (d) in 1978. The Sierra Club cites two cases that involve the courts' obligation to reconcile multiple state statutes addressing a single subject, but those cases have no bearing when a state statute and a federal statute, each addressing a different permitting decision, are at issue. (See DeVita v. County of Napa (1995) 9 Cal.4th 763, 778, 38 Cal.Rptr.2d 699, 889 P.2d 1019 [reconciling Election Code and Government Code provisions]; People v. Andrade (2002) 100 Cal.App.4th 351, 357, 121 Cal.Rptr.2d 923 [harmonizing Penal Code sections].) The provisions of the CZMA, a federal law, offer us no reason to arrive at a different interpretation of section 30604, subdivision (d).
Our holding that the Commission is barred from considering environmental impacts emanating from outside the coastal zone will not result in those impacts being ignored, nor will it leave the environment unprotected. The Legislature has seen fit to spread the responsibility for coastal protection between state and local agencies. (See § 30004.) Local government still has a vital role: "[t]o achieve maximum responsiveness to local conditions, accountability and public accessibility, it is necessary to rely heavily on local government and local land use planning procedures and enforcement." (§ 30004, subd. (a).) Consideration of environmental impacts originating outside the coastal zone is the responsibility of the local agency with authority over their point of originhere, the City. It is not the responsibility of the Commission.
The Commission's conclusion that the portions of the Project inside the coastal zone are consistent with the environmental policies of the Coastal Act is supported by substantial evidence. In confining its analysis to these portions of the Project, the Commission respected the boundaries on its power set out for it by the Legislature. The trial court properly denied the Sierra Club's petition for a writ of mandate on this basis.

D. The Commission Was Permitted to Adopt Formal Written Findings After Its Approval of the Project

Before the August 7, 2000, hearing on the Project, the Commission's staff prepared *197 a detailed report addressing the Project and its consistency with the Coastal Act and California Environmental Quality Act (CEQA). The staff report recommended approval of the Project, subject to elimination of Street A, and included findings supporting its recommendation.
The Commission adopted the staff recommendations and approved the Project, with one notable change; it approved the Project with Street A. Because the draft findings did not address the consistency of this version of the Project with the Coastal Act and CEQA, the Commission directed its staff to prepare revised findings. At a December 11, 2000, meeting, the Commission approved these revised findings.
The Sierra Club contends that this procedure was improper. It argues that the Coastal Act prohibits the Commission from approving a project first and issuing revised written findings later. In our previous decision, we expressly reserved opinion on whether it was proper for the Coastal Commission to adopt written findings after it had issued a permit. We now conclude that post-hearing revised written findings are lawful under the circumstances presented here.
The Coastal Act requires that Commission decisions be supported by findings. (§ 30604, subds.(a)-(c).) Code of Civil Procedure section 1094.5, the basis for the Sierra Club's petition, imposes a similar requirement. "[I]mplicit in section 1094.5 is a requirement that the agency which renders the challenged decision must set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order." (Topanga Assn. for a Scenic Community v. County of Los Angeles (1974) 11 Cal.3d 506, 515, 113 Cal.Rptr. 836, 522 P.2d 12 (Topanga).) Section 1094.5 thus requires an agency to reveal the route it took from evidence to action. (Ibid.) We agree with the Sierra Club's contention that the reasoning from evidence to action must precede the decision to act; post hoc rationalizations arrived at only after an agency has made up its mind are of no benefit to a court attempting to evaluate an agency's action under section 1094.5, and they do not satisfy Topanga's requirement that the agency reveal the analytical route actually taken.
However, it is one thing to say that the agency's reasoning must precede its decision. It is quite another to say, as the Sierra Club argues, that the written findings which manifest the agency's reasoning must precede the decision. There is no such requirement in the Coastal Act or in Code of Civil Procedure section 1094.5. By analogy, it is commonplace for trial courts to first indicate their views on a matter at a hearing and only later adopt a written order or set of findings spelling out their decision. This does not mean that the written order consists only of post hoc rationalizations; instead, it means that the process of documenting the reasoning leading up to a decision may follow the actual rendering of that decision. The Sierra Club offers no statutory authority to support the argument that the Legislature intended to preclude agencies such as the Commission from proceeding in a similar fashion and announcing decisions prior to the preparation and approval of formal findings.
Regulations adopted under the Coastal Act authorize the procedure followed by the Commission in this case. California Code of Regulations, title 14, section 13096, subdivision (a) provides: "All decisions of the commission relating to permit applications shall be accompanied by written conclusions about the consistency of the application with [the Public Resources Code] and findings of fact and reasoning supporting the decision." The regulations *198 recognize that decisions of the commission will sometimes be "different than those proposed by the staff in the staff recommendation ...." (Cal.Code Regs., tit. 14, § 13090, subd. (d).) When that occurs, the prevailing commissioners must "state the basis for their action in sufficient detail to allow staff to prepare a revised report with proposed revised findings that reflect the action of the commission." (Id., § 13096, subd. (b).) The commissioners must then approve the revised findings at a public hearing. "The public hearing shall solely address whether the proposed revised findings reflect the action of the commission." (Id, § 13096, subd. (c).) We see no inconsistency between the procedure permitted by these regulations and any statutory requirements; notably, neither Public Resources Code section 30604 nor Code of Civil Procedure section 1094.5 specifies when the required findings must be made.
Our conclusion is consistent with that of the Second District, which recently upheld the issuance of postdecision revised findings. (La Costa Beach Homeowners' Assn. v. California Coastal Com. (2002) 101 Cal. App.4th 804, 819, 124 Cal.Rptr.2d 618 (La Costa).) In La Costa, three homeowners sought approval of a plan to demolish the existing homes on their seaside lots and construct new residences. The Commission approved their permits, including an oral modification to certain conditions imposed on the permits. Because of this modification, the Commission staff issued revised proposed findings six weeks after the approval hearing. These revised findings reflected the actions actually taken by the Commission at the approval hearing and included an expanded justification for the approval. (Id. at p. 812 & fn. 5, 124 Cal.Rptr.2d 618.) The Commission adopted the revised findings two months after the approval hearing. (Id. at p. 813, 124 Cal. Rptr.2d 618.)
Neighbors petitioned to overturn the Commission's actions. They argued that the posthearing revised findings were "post hoc rationalizations of a decision that was not otherwise supported." (La Costa, supra, 101 Cal.App.4th at p. 819, 124 Cal. Rptr.2d 618.) The Second District disagreed. It upheld the post-approval revised findings as simply "reflect[ing] in writing the rationale that the Commissioners and staff articulated on the record at the [approval] hearing." (Ibid.) Implicit in La Costa is the recognition that the Commission mayindeed, mustissue revised findings when the decision it reaches departs in one or more particulars from the recommendation supplied by staff. We agree with that conclusion.
The Sierra Club expresses concern that the formal findings were adopted after litigation had ensued. This posed no obstacle in La Costa, where findings were likewise adopted after a petition had been filed, and it poses no obstacle here. We decline to adopt a rule that would preclude an agency from spelling out its reasoning once a petition for a writ of mandate has been filed. We also decline to adopt a rule specifying just how promptly written findings must be made. It is always easier to be certain that an agency's stated reasoning is bona fide when findings are issued before a decision is reached, and the longer an agency waits to explain its decision, the more one might question whether the approved findings reflect the actual reasoning. On the other hand, the Commission's role is not to serve as a rubber stamp for its staffs recommendations. If the Commission affords a meaningful hearing to the parties before it and reaches conclusions significantly different from those proposed by staff, a longer revision period may be necessary. Ultimately, procedural objections to whether findings are sufficient must be *199 decided on a case-by-case basis, according to the standard spelled out by Topanga: Has the agency revealed its actual, pre-decision reasoning in sufficient detail to allow judicial review? If so, then from a procedural standpoint, the agency's findings are sufficient.
This rule does not mean that post-approval findings will always be acceptable. An agency must reason first, and reach its decision second. Written findings may come before or after, so long as they reflect the reasoning actually engaged in before the decision has been reached. In Bam, Inc. v. Board of Police Comrs. (1992) 7 Cal.App.4th 1343, 9 Cal.Rptr.2d 738 (Bam), for example, an agency-appointed hearing examiner prepared detailed factual findings concerning an adult motion picture arcade's operations and recommended that the agency deny a pending application to suspend the arcade's license. After a hearing, the agency rejected the examiner's recommendation with "nary a word of explanation." (Id. at p. 1348, 9 Cal.Rptr.2d 738.) Revised findings were apparently prepared, but never adopted. (Id. at p. 1349, fn. 4, 9 Cal.Rptr.2d 738.) The court of appeal properly directed the trial court to issue a writ of mandate vacating the license suspension and requiring the agency to issue findings before it made a new decision. It did so because the record left it "at a loss to understand why the Board did what it did." (Id. at p. 1346, 9 Cal.Rptr.2d 738.)
This case resembles La Costa, not Bam. The record reveals why the Commission acted as it did, and the revised findings adopted in December 2000 reflect the Commission's actual reasoning, rather than a post hoc rationalization. For all subjects other than Street A, the revised findings mirror the proposed findings prepared before the August 7, 2000, hearing. With respect to Street A, those commissioners voting to allow Street A explained their reasoning at the August 7 hearing, citing its limited visibility and the corresponding Project benefits, including the prevention of future bluff-face development. The revised findings on Street A track these reasons. Consequently, the record reveals the analytical route the Commission took in reaching its conclusions, in accord with Topanga.

III. The Commission's Decision Complies with CEQA[***]

Disposition
The judgment is affirmed. The stay issued October 10, 2002, is dissolved.
We concur: STEVENS, ACTING P.J., and SIMONS, J.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II.B and all its subparts and part III.
[1] The City did not appear in this action. However, appellant Spirit of the Sage Council also sued the City in a separate action in Los Angeles Superior Court, challenging its approval of the Project. The City prevailed in the trial court in that action. The appeal in Coalition of Concerned Communities v. City of Los Angeles, B149092, is pending in the Second District.
[2] Unless otherwise indicated, all further section references are to the Public Resources Code.
[**] See footnote *, ante.
[4] The informal opinion letter addressed the question we face: "To what extent may the coastal commissions assert jurisdiction over developments that take place on parcels of land that lie partly inside and partly outside the inland coastal zone boundary?" (Cal. Atty. Gen., Indexed Letter, No. SO IL 77/20, August 26, 1977, p. 2.) The opinion letter concluded in part, "It is submitted that the Legislature intended to authorize the commission to deny permits on the basis that the portion of a development outside the coastal zone would have adverse environmental impacts inside the coastal zone." (Id. at p. 6.) This is precisely the position the Sierra Club now urges upon us.
[5] Nor, we should note, has the Commission asked us to do so. At oral argument, counsel for the Commission candidly acknowledged that the Commission is usually more than willing to seek to expand its jurisdiction; this case represents the rare instance in which it is not seeking to do so, in recognition of legislatively imposed limits on that jurisdiction.
[***] See footnote *, ante.