Filed 6/23/22 Trask Properties III v. City of L.A. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| TRASK PROPERTIES III, LLC,<br><br>    Petitioner and Appellant,<br><br>v.<br><br>CITY OF LOS ANGELES,<br><br>    Respondent. | B309511<br><br>(Los Angeles County<br> Super.Ct.No. 19STCP00644) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mary H. Strobel, Judge. Affirmed.

Jeffer, Mangels, Butler & Mitchell, Benjamin M. Reznik, Lara R. Leitner and Matthew D. Hinks for Petitioner and Appellant.

Michael N. Feuer, City Attorney, Terry Kaufmann Macias, Oscar Medellin and Patrick Hagan, Deputy City Attorneys, for Respondent.

_____

Petitioner Trask Properties III, LLC (Petitioner) is a limited liability company that operates a Toyota dealership in Marina Del Rey. It also owns a

plot of land in Marina Del Rey that is zoned as Zone A1-1 (single-family dwellings and agricultural uses only) and located in the "Coastal Zone" as defined by the California Coastal Commission under the California Coastal Act of 1976 (Pub. Resources Code, §§ 30000 et seq.) and Los Angeles Municipal Code section 12.20.2.[1]

Planning to build a parking lot on the tract, Petitioner applied to respondent City of Los Angeles (City) for a conditional use permit (CUP) and a coastal development permit (Coastal Permit). The City Zoning Administrator (ZA) granted the applications. Opponents of the ZA's decision appealed to the West Los Angeles Area Planning Commission (Commission), which reversed the ZA's grant of the CUP and the Coastal Permit. In sum, the Commission determined that the ZA erred in granting the Coastal Permit, because the tract contained "wetlands" (Pub. Resources Code,

---

[1] In relevant part, Public Resources Code section 30103, subdivision (a) provides: "'Coastal zone' means that land and water area of the State of California from the Oregon border to the border of the Republic of Mexico, specified on the maps identified and set forth in Section 17 of Chapter 1330 of the Statutes of 1976. . . . In significant coastal estuarine, habitat, and recreational areas it extends inland to the first major ridgeline paralleling the sea or five miles from the mean high tide line of the sea, whichever is less, and in developed urban areas the zone generally extends inland less than 1,000 yards."

In turn, LAMC section 12.20.2 provides in relevant part: "'Coastal Zone' "shall mean that land and water area within the City of Los Angeles as specified on maps prepared by the California Coastal Commission, copies of which are on file with the Department of City Planning and the Office of City Engineer. [¶] Such 'coastal zone' extends seaward to the City's outer limit of jurisdiction, and generally extends inland 1000 yards from the mean high tide line of the sea. In significant coastal estuarine, habitat and recreational areas it extends inland to the first major ridgeline paralleling the sea or five miles from the mean high tide line of the sea, whichever is less, and in developed urban areas the zone extends inland 1000 yards." (LAMC, § 12.20.2, subd. B.)

§ 30121; Cal Code Regs, tit 14, § 13577), and because the proposed construction would dike, fill, or dredge wetlands in violation of Public Resources Code section 30233. The Commission also reversed the ZA's decision granting the CUP because, *inter alia*, construction of the proposed parking lot would not enhance the built environment or benefit the community and would degrade the adjacent properties and wetlands.

Petitioner petitioned the superior court for a writ of administrative mandate setting aside the Commission's decision reversing the ZA. The superior court denied the petition, and Petitioner now appeals to this court. Petitioner contends: (1) the Commission lost jurisdiction by failing to act on the appeal within the requisite time period set forth in Los Angeles Municipal Code section 12.24, thereby rendering the ZA's decision final by operation of law; (2) the Commission failed to make the requisite findings to support its reversal of the ZA; and (3) substantial evidence does not support the Commission's findings that the Project failed to satisfy the requisite criteria for a Coastal Permit and CUP. We disagree with the contentions and affirm the superior court's denial of administrative mandamus.

## BACKGROUND

1. *Permit Requirements Under the California Coastal Act and the Los Angeles Municipal Code*

Construction within the Coastal Zone requires a Coastal Permit from the City. (Pub. Resources Code, § 30600, subd. (b); Los Angeles Municipal Code, § 12.20.2, subd. C.)[2] Moreover, in certain areas, referred to as dual

---

[2] Undesignated section references shall be to the Public Resources Code. The Los Angeles Municipal Code shall be referred to as LAMC.

permit jurisdictions, an applicant must also obtain a second permit from the California Coastal Commission. (§ 30600, 30601; Cal. Code Regs., tit. 14, § 13301, subd. (a).) Property located within 100 feet of a wetland qualifies as a dual jurisdiction zone. (§§ 30601, 30601(2); LAMC, § 2.20.2, subds. C & G.1.) Further, when proposed construction on a parcel is "not permitted by right" under the controlling zoning classification, the project cannot proceed without a CUP granted by the City. (LAMC, § 12.24.)

### 2. *The Property and the Project*

On January 27, 2016, Petitioner filed an application with the City to construct a surface parking lot for 308 cars (the Project) on a parcel it owns at 13200 West Mindanao Way in Marina Del Rey (the Property). The Property is a long, narrow undeveloped tract (1,862 feet long and 60 feet wide, covering 110,007 square feet) that borders to the east on the Ballona Wetlands Ecological Reserve. Although for zoning purposes Petitioner characterized the Project as a "public parking lot," it was intended to serve as inventory storage and employee parking for Petitioner's nearby Toyota Dealership.

The Property is zoned as Zone A1 (single-family dwellings and agricultural uses only) and is within the Coastal Zone. Therefore, Petitioner applied to the City for a CUP pursuant to LAMC section 12.24 and for a Coastal Permit under LAMC section 12.20.2, subdivision B.

### 3. *Zoning Administrator's Approval of Project*

Petitioner's applications were initially presented to the ZA.[3] To satisfy its duties under the California Environmental Quality Act (CEQA; §§ 21000

---

[3] Under the LAMC, the ZA is the initial decision maker for a CUP for a parking facility in an A-1 zone. (LAMC, § 12.24, subd. W.) Further, the ZA

4

et. seq.), the City prepared an Initial Study and Mitigated Negative Declaration (MND) dated May 18, 2016. (§ 21092; Cal. Code Regs., tit. 14, § 15072.) In reliance on the report, the MND concluded that the environmental impact of the Project would be insignificant or in the alternative could be mitigated to a level of insignificance. Using the definition "wetlands" under federal law, the MND also concluded that the Property "does not contain any *federally protected* wetlands, wetland resources, or other waters of the United States as defined by Section 404 of the Clean Water Act." (Italics added.)

As we discuss more fully in our Discussion, *post*, the controlling definition of wetlands is that used by the California Coastal Commission, which differs significantly from the definition used by federal law. The MND did not consider whether wetlands existed on the Property under that controlling definition.

On May 18, 2016, the ZA held a hearing on the Project. At the hearing, members of the public objected that Project would, among other things, pave over wetlands on the Property, remove mature trees, and threaten sensitive species. To allow Petitioner to address those concerns, the ZA took the matter under advisement.

The City later prepared a second MND (which it circulated on August 31, 2017), expressly citing to submissions by Petitioner's environmental consulting firm.[4] The second MND, like the first, concluded that "[t]he

---

has authority to grant a Coastal Permit. (LAMC, § 12.24, subds. C, U, V, W & X; § 12.20.2, subd. G.1.)

[4] The first MND stated at the outset of the report that in preparing the MND the City relied, *inter alia*, on submissions by the applicant. The second MND expressly cited to reports prepared by Petitioner's environmental consulting firm. Petitioner's experts utilized the USACE/Clean Water Act criteria to conclude that no wetlands existed on the property.

5

project sites do not contain any federally protected wetlands" under the Clean Water Act, and added that "[t]he USACE [United States Army Corp of Engineers] has regulatory jurisdiction over traditional navigable waters and tributaries with relatively permanent flow." It declared that "a drainage feature on the East Site appears to have been excavated as part of the Marina Expressway construction, as opposed to being a natural feature, and the drainage features on both project sites appear to only drain the surrounding urban areas. . . . As such, the project would not have any effect on federally protected wetlands as defined by Section 404 of the Clean Water Act." As before, the second MND did not consider whether any wetlands existed under the controlling California definition.

The next hearing before the ZA was held on January 17, 2018. At the hearing, Petitioner's representative characterized the second MND in relevant part as having "evaluated the drainage ditch along the 90 freeway [the Marina Expressway]" and as having "determined [it not] to be a wetland."

On April 30, 2018, the ZA approved the Project (with conditions not relevant here). In granting the Coastal Permit, the ZA determined that the Project was in conformity with Chapter 3 of the California Coastal Act, section 30233, because "[t]here will be no dredging, filling, or diking of coastal waters or wetlands associated with the request, and there are no sensitive habitat areas, archaeological, or paleontological resources identified on the site." The ZA further concluded that the property site was within "the single permit jurisdiction of the Coastal Zone."

In granting the CUP, the ZA found the Project would be beneficial to the community by improving drainage to the site and by adding security and low-level lighting to prevent trespassing and other nuisances on the property.

6

4.  *Appeal and Final Determination by the West Los Angeles Area Planning Commission*

On May 15, 2018, two opponents of the project—the Ballona Institute and the Villa Napoli Homeowner's Association (collectively "administrative appellants")—timely appealed the Project to the West Los Angeles Area Planning Commission (Commission). The administrative appellants asserted, *inter alia*, that in concluding the project did not encompass any wetlands, Petitioner's consultants and, in turn, the MND and the ZA, erroneously applied the narrow definition of wetlands used by the USACE for the Clean Water Act, rather than the more expansive definition used by the California Coastal Commission.  The administrative appellants submitted documentation indicating the Coastal Commission considered the site to be within the dual jurisdiction zone, due to the existence of wetlands,  and a survey of the property by local biologist Robert "Roy" Van de Hoek, indicating there are wetlands on the property.

On July 27, 2018, the Coastal Commission sent an email to the City's Department of Planning stating that it considers the Property to be within the dual zone "because of the presence of a stream/wetland on the propert[y] which has been referred to as a drainage ditch."  The letter stated that "the extent of the wetlands on the sites will need to be determined by a qualified ecologist as part of the coastal development permit application process (i.e., wetland delineation)."

On July 30, 2018, Petitioner's counsel sent a letter to the Commission asking for a continuance of the next hearing, scheduled for August 1, 2018, to allow petitioner to address the issues raised by the administrative appellants. At the hearing on August 1, 2018 Petitioner's counsel appeared before the

7

Commission and asked for a continuance "for three months to mid-November." Counsel stated that the purpose of the continuance was to prepare and submit into the record a wetland delineation study under the criteria used by the California Coastal Commission. Over the objection of the administrative appellants, the Commission granted Petitioner's request and continued the hearing to December 5, 2018.

At the hearing on December 5, 2018, members of the public testified in opposition to the Project, including local biologist, and President of the Ballona Institute, Van de Hoek, who had twice personally surveyed the site and identified fourteen distinct wetlands as defined by the California Coastal Act. Van de Hoek also prepared a bound study entitled "The Marina Wetlands: An Appeal for a Rational Decision," that contained photographs and other evidence regarding the various wetlands on site. The report described in detail where each wetland lies, the type of soils present, and the type of fauna supported by those various plants and soils.

Petitioner provided their own expert report and presented the testimony of biologist Dr. Edith Read. Petitioner's consultants admitted (in somewhat contradictory and at times equivocal language) that a small portion of the Property includes wetlands, but argued the wetlands were too small to be meaningful and/or that the damage to the wetlands could be avoided or mitigated.[5]

---

[5]   In this appeal, neither party contends that the appeal before the Commission was limited solely to the record presented to the ZA. (See *West Chandler Boulevard Neighborhood Assn. v. City of Los Angeles* (2011) 198 Cal.App.4th 1506, 1520, 1533 [LAMC requires appeal of a CUP decision to be based on the record presented to the ZA].) Thus, we do not address this issue, and we consider the additional evidence submitted by the parties to the Commission.

After deliberation, the Commission unanimously found that the ZA erred in approving the Project, because in violation of section 30233, it would dike, fill, or dredge wetlands. Based largely on that finding, the Commission further found that the project would not serve the community, but was for the benefit of Petitioner and its auto dealership. The Commission's findings and the relevant evidence are discussed in more detail in the Discussion portion of our opinion, *post*.

5. *Petition for Administrative Mandate*

Petitioner petitioned the superior court for a writ of administrative mandate pursuant to Code of Civil Procedure section 1094.5 to set aside the Commission's decision. Petitioner raised the same contentions that it now raises in this appeal. Following a hearing, the superior court denied the petition in a lengthy, well-reasoned opinion.

## DISCUSSION

Petitioner challenges the Commission's decision to overturn the ZA's grant of the CUP and Coastal Permit on three grounds: (1) the Commission lost jurisdiction to reverse the ZA by failing to act on the appeal within the period specified by LAMC, section 12.24, subdivision I.2, thereby rendering the ZA's decision final by operation of law; (2) the Commission failed to make the requisite findings to support its decision; and (3) substantial evidence does not support the Commission's determination that the Project failed to satisfy the requisite criteria for a Coastal Permit and CUP. We discuss and reject Petitioners contentions in turn.

Our standard of review is well settled. Code of Civil Procedure section 1094.5, the state's administrative mandamus provision, provides the

9

procedure for judicial review of adjudicatory decisions rendered by administrative agencies. (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514 (*Topanga I*).) "'The question presented by a petition for writ of administrative mandate is whether the agency or tribunal that issued the decision being challenged "proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion."'" (*Lateef v. City of Madera* (2020) 45 Cal.App.5th 245, 252 (*Lateef*).) Under Code of Civil Procedure section 1094.5, "''[a]buse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence."'" (*Lateef*, at p. 252; see Code Civ. Proc., § 1094.5, subd. (b); see also Gov. Code, § 65010, subd. (b) [no erroneous action by public agency will be set aside by court unless court finds error was prejudicial].)

Where the administrative decision does not affect a fundamental vested right, as here, the substantial evidence standard of review governs the writ petition. (See *Toigo v. Town of Ross* (1998) 70 Cal.App.4th 309, 317 [applying substantial evidence review to land use decisions]; *Desmond v. County of Contra Costa* (1993) 21 Cal.App.4th 330, 334–335.)

I. *Jurisdictional Challenges*

LAMC section 12.24 allows parties aggrieved by an initial decision of the ZA to appeal that decision to the Area Planning Commission within 15 days of the mailing of that decision. (LAMC, § 12.24, subd. I.2.) That section further provides that "[t]he appellate body shall act *within 75 days after the expiration of the appeal period* or within any additional period mutually agreed upon by the applicant and the appellate body. The failure of the

10

appellate body to adopt a resolution within this time period shall be deemed a denial of the appeal." (LAMC, § 12.24, subd. I.4, italics added.)

In this case, the appeal period expired on May 15, 2018 (on which date the administrative appellants timely filed their appeal). Seventy-five days after that date was July 29, 2018. The Commission reached its decision on December 5, 2018. Therefore, Petitioner contends that the Commission lost jurisdiction over the appeal, and the ZA's decision became final. We conclude that, as argued by the City, Petitioner forfeited its right to object on this ground to the Commission's decision.[6]

"There are essentially two kinds of jurisdictional errors with different consequences. "'Lack of jurisdiction in its most fundamental or strict sense means an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties." [Citation.] When a court lacks jurisdiction in a fundamental sense, an ensuing judgment is void, and "thus vulnerable to direct or collateral attack at any time."' [Citation]. However, the phrase 'lack of jurisdiction' 'may also "be applied to a case where, though the court has jurisdiction over the subject matter and the parties in the fundamental sense, it has no 'jurisdiction' (or power) to act except in a particular manner, or to give certain kinds of relief, or to act without the occurrence of certain procedural prerequisites." [Citation.]

---

[6] In rejecting this argument below, the superior court concluded that Petitioner and the Commission "mutually agreed" upon the continuance within the meaning of LAMC, section 12.24, subdivision I.4. Further, to the extent petitioner requested a continuance to "mid-November"—as opposed to December 5, 2018, the hearing date—the superior court concluded that Petitioner waived any objection by failing to object to the extended date. Because we conclude that Petitioner forfeited its right to object *at all* to any delay in the Commission's decision, we need not decide whether Petitioner and the Commission "mutually agreed" to extend the applicable time period within the meaning of section 12.24.

11

"'[W]hen a statute authorizes [a] prescribed procedure, and the court acts contrary to the authority thus conferred, it has exceeded its jurisdiction.'" [Citation.] *When a court has fundamental jurisdiction, but acts in excess of its jurisdiction, its act or judgment is merely voidable.*' [Citation.]" (*Mt. Holyoke Homes, LP v. California Coastal Com.* (2008) 167 Cal.App.4th 830, 840–841 (*Mt. Holyoke Homes*), italics added, fn. omitted.)

A party may be precluded from seeking to set aside an act in excess of jurisdiction "because of waiver, estoppel, or the passage of time." (*People v. Ford* (2015) 61 Cal.4th 282, 287 (*Ford*); see also *People v. Tindall* (2000) 24 Cal.4th 767, 776; see also *Saffer v. JP Morgan Chase Bank, N.A.* (2014) 225 Cal.App.4th 1239, 1248.) Here, the administrative appellants timely appealed the ZA's approval of the project, and thus the Planning Commission had jurisdiction in the fundamental sense—i.e., authority over the subject matter and/or parties before it.[7] (*Mt. Holyoke Homes*, *supra,* 167 Cal.App.4th at p. 841.) As such, the Commission's failure to render its decision within 75 days following expiration of the appeal period is, at best, an act in *excess of jurisdiction*.[8] (See *Mt. Holyoke Homes*, *supra*, 167 Cal.App.4th at p. 841.)

---

[7] We further note that Los Angeles Municipal Code section 12.24 provides that "[t]he filing of an appeal stays proceedings in the matter until the appellate body has made a decision." (LAMC, § 12.24, subd. I.2.) This further confirms that the Commission had fundamental jurisdiction over this matter once appellants filed a timely appeal.

[8] The fact that section 12.24 *expressly* authorizes a waiver of this time limit by mutual consent between the applicant and the Planning Commission, further reinforces our conclusion that the expiration of the 75-day deadline does not divest the Commission of its jurisdiction in the fundamental sense. (See *Mt. Holyoke Homes*, *supra*, 167 Cal.App.4th at p. 841, fn. 7 [making same observation in reference to statute requiring Commission to hold hearing within specified time, but authorizing waiver of time limit by applicant—in light of established case law holding that

In concluding that Petitioner has forfeited its right to resurrect the ZA's decision because the Commission exceeded the 75-day time period specified in LAMC section 12.24, subdivision I.4, we find *Mt. Holyoke Homes, supra,* instructive.

In *Mt. Holyoke Homes*, a home developer argued that the Coastal Commission lost jurisdiction of a project opponent's appeal pursuant to section 30621, subdivision (a) either on August 2, 1999, which was 49 days from the date the project opponent filed her appeal, or on January 25, 2000, which was 49 days from the date the developer provided the city council's file to the Commission. (*Mt. Holyoke Homes, supra*, 167 Cal.App.4th at p. 842.) The developer, however, did not object to the Commission's exercise of jurisdiction until June 7, 2003, three and one-half years after the latest date on which it contended the Commission lost jurisdiction. (*Ibid*.) During that time, the developer readily provided information to the Commission in response to several requests. (*Ibid*.) The Court of Appeal concluded that the developer's actions over such an extended period of time constituted consent to the Commission's exercise of jurisdiction and thus the doctrines of estoppel, waiver, and/or invited error precluded the developer from challenging the Commission's jurisdiction. (*Id.* at p. 844 ["While [the developer] may have believed it was attempting to amicably resolve the Commission's concerns over its proposed three-lot subdivision and facilitate approval of its project, it nevertheless had an obligation to contest the Commission's jurisdiction promptly after the date on which it contends the Commission lost it"].)

---

fundamental jurisdiction cannot be conferred by consent, waiver or estoppel].) Indeed, Petitioner in its opening brief argues the Commission's "belated action to grant the appeal occurred in *excess of its* jurisdiction." (Italics added.)

The same reasoning applies here, but with more force. In proceedings before the Commission, petitioner never objected that the 75-day period of LAMC, section 12.24, subdivision I.2 expired on July 29, 2018. To the contrary, on July 30, 2018, Petitioner's counsel sent a letter to the Commission seeking a continuance of the hearing scheduled for August 1, 2018, to allow Petitioner to address the issues raised by the administrative appellants. At the hearing on August 1, 2018, Petitioner's counsel asked for a continuance "for three months to mid-November." The purpose was to prepare and submit a wetland delineation study under the criteria used by the California Coastal Commission. Over the objection of the administrative appellants, the Commission granted Petitioner's request and continued the hearing to December 5, 2018. Petitioner appeared without objection at the hearing, presented its new evidence to the Commission, and (without objection based on LAMC, § 12.24, subd. I.4) lost on the merits.

Thus, petitioner was not merely silent during the contested period as was the developer in *Mt. Holyoke*. To the contrary, Petitioner encouraged and took advantage of the delay until the date of the dispositive hearing. Not until Petitioner sought to challenge the Commission's decision by petition for writ of administrative mandate did it, for the first time, object that the Commission had lost jurisdiction on July 29, 2018.

"Such conduct amounts to an unacceptable trifling with a public agency and the courts." (*Mt. Holyoke Homes*, *supra*, 167 Cal.App.4th at p. 845; cf. *People v. Kennedy* (2005) 36 Cal.4th 595, 612; disapproved on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 458–459 ["[T]he forfeiture rule ensures that the opposing party is given an opportunity to address the objection, and it prevents a party from engaging in gamesmanship by choosing not to object, awaiting the outcome, and then claiming error"].)

14

In its briefing before this court, Petitioner cites a string of cases to support its loss-of-jurisdiction claim, including *Tran v. City of Los Angeles* (2022) 74 Cal.App.5th 154; 1305 *Ingraham, LLC v. City of Los Angeles* (2019) 32 Cal.App.5th 1253, 1256; *Mumaw v. City of Glendale* (1969) 270 Cal.App.2d 454; *Harris v. Alcoholic Bev. etc. Appeals Bd.* (1963) 223 Cal.App.2d 563; *Napa Savings Bank v. Napa County* (1911) 17 Cal.App. 545. We first note that petitioner presented none of these cases to the superior court.

Regardless, none of Petitioner's cases discusses forfeiture of the right to challenge administrative decisions made in excess of jurisdiction. Rather, they turn on the question whether the challenged deadline identified by statute or municipal code is mandatory or discretionary. (See *People v. Knoller* (2007) 41 Cal.4th 139, 155 [""'An opinion is not authority for propositions not considered'""].) Moreover, as observed in *Mt. Holyoke Homes*, the question whether the right to raise an administrative time limit is forfeited does not turn on whether the time limit is mandatory in nature, but whether the violation at issue implicates a tribunal's fundamental jurisdiction or is simply an act in excess of that jurisdiction. (See *Mt. Holyoke Homes*, *supra*, 167 Cal.App.4th at p. 841; see also *California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1147 ["[w]hen the Legislature has specified a time within which an administrative board is to render a decision, that time limit may be mandatory in the obligatory sense, but this 'does not necessarily mean that a failure to comply with its provisions causes a loss of jurisdiction'"]; cf. *People v. Allen* (2007) 42 Cal.4th 91, 101–105 [time provision held mandatory but its violation did not deprive court of fundamental jurisdiction].) To the extent Petitioner points out that LAMC section 12.24 expressly sets forth a consequence for the failure to timely act on the appeal (i.e., that the failure to act "shall be

15

deemed a denial of the appeal," per subd. I.4), so too did the statute(s) at issue in *Mt. Holyoke Homes*. (*Mt. Holyoke Homes*, *supra*, 167 Cal.App.4th at pp. 835–836, fn. 4 [noting that pursuant to § 30625, the consequence for failure to hold a timely hearing—as required by § 30621—is that the appeal "'shall become final, unless the time limit . . . is waived by the applicant'"].) As such, Petitioner's attempt at distinguishing *Mt. Holyoke Homes* falls short.

Petitioner also argues that it could not have "knowingly" waived its objection to the Commission's jurisdiction because it was unaware of the consequences of that waiver. However, as the court found in *Mt. Holyoke Homes*, "[e]stoppel [to challenge jurisdiction] in this context is more akin to acquiescence or a forfeiture, which is 'a failure to object or to invoke a right,' not the 'express relinquishment of a right or privilege.'" (*Id.* at p. 844, citing In re *Sheena K.* (2007) 40 Cal.4th 875, 880, fn. 1; cf. *Ford*, *supra*, 61 Cal.4th at p. 288 ["We have long recognized that a failure to object can constitute implied consent to an act in excess of the court's jurisdiction"]; *Harrington v. Superior Court* (1924) 194 Cal. 185, 188–189 ["if the court has jurisdiction of the subject matter, . . . a party may voluntarily submit himself to the jurisdiction of the court, or may, by failing to seasonably object thereto, waive his right to question jurisdiction"].)

In short, Petitioner never sought to invoke the 75-day deadline in proceedings before the Commission, and obtained exactly what it wanted: a new hearing date on which to present its new evidence to the Commission. Under these circumstances, petitioner should not be heard to complain.

In a related contention, Petitioner argues that the Commission's decision was faulty because it did not take the form of a formal "resolution." By its literal terms, section 12.24 of the Los Angeles Municipal Code states that "[t]he failure of the appellate body *to adopt a resolution* within [the

16

specified 75 day] time period shall be deemed a denial of the appeal."
(LAMC, § 12.24, subd. I.4, italics added.)  In contrast, as we explain in more
detail in section II of our Discussion, *post,* the Commission unanimously
approved a formal motion by Commissioner Walz-Morocco to grant the appeal
and incorporated several findings.

The superior court rejected this argument on the ground that the
Commission did, in fact, act on December 5, 2018, by taking a vote of all
members of the Commission on the motion to grant the appeal.  As the trial
court pointed out, "Petitioner's narrow focus on the term 'resolution' in LAMC
section 12.24.I elevates form over substance and ignores the manner in which
[Planning Commission] decisions are routinely recorded."  We cannot say it
any better.  (See *West Los Angeles Area Planning Commission*, Rule 9.1,
describing an "action" of the commission as a motion that is seconded and
voted upon]; cf. *Bel Mar Estates v. California Coastal Com.*  (1981) 115
Cal.App.3d 936, 940 [characterizing challenge to lack of "formal vote" on
continuance by Commission as "frivolous" in light of record demonstrating
continuance was agreeable to all members of Commission].)[9]

II.  *Adequacy of the Commission's Findings*

Petitioner contends that the Planning Commission failed to make
adequate findings in violation of the relevant provisions of the LAMC and
*Topanga I, supra,* 11 Cal.3d 506 and  We disagree.

---

[9]      Moreover, Petitioner shows no prejudice from the Commission's
procedure of voting on a motion, as opposed to approving a resolution.  (Code
Civ. Proc., § 1094.5, subd. (b); *Thornbrough v. Western Placer Unified School
Dist.* (2013) 223 Cal.App.4th 169, 200 [a court will not issue a writ of
administrative mandate unless the petitioner shows that the agency's alleged
error "'prejudicially affect[ed] the petitioner's substantial rights'"]; cf.
*Mattison v. City of Signal Hill* (1966) 241 Cal.App.2d 576, 584 ["technical
noncompliance with some of the procedural rules" does not compel reversal
unless prejudicial].)

17

A. *LAMC Requirements*

Depending on whether the appeal is of the granting of a CUP or a Coastal Permit, the LAMC imposes similar, although slightly different, requirements on the appellate body's decision. In an appeal of a Coastal Permit decision, "[a]ction on any appeal shall be in writing, and if the appeal is granted, in whole or in part, such decision shall set forth wherein the permit granting authority, or the lower appeal body erred in its action on the permit under the criteria set forth in Section 12.20.2 G.l(a) through (e)." (LAMC, § 12.20.2, subd. H.4.)

In an appeal of a CUP decision, "the appellate body shall make its decision, based on the record, as to whether the initial decision-maker erred or abused his or her discretion." (LAMC, § 12.24., subd. I.3.) The appellate body may reverse or modify the decision of the ZA, and "any resolution to approve must contain the same findings required to be made by the initial decision-maker, supported by facts in the record." (LAMC, § 12.24, subd. I.5.)

B. *Topanga I*

In *Topanga I, supra,* 11 Cal.3d 506, our Supreme Court held that "implicit in . . . section 1094.5 is a requirement that the agency which renders the challenged decision must set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order." (*Id.* at p. 515.) The findings must be sufficient "both to enable the parties to determine whether and on what basis they should seek review and, in the event of review, to apprise a reviewing court of the basis for the [administrative] action." (*Id.* at p. 514.) However, "[a]dministrative agency findings are generally permitted considerable latitude with regard to their precision,

18

formality, and matters reasonably implied therein." (*Southern Pacific Transportation Co. v. State Bd. of Equalization* (1987) 191 Cal.App.3d 938, 954; see also *Young v. City of Coronado* (2017) 10 Cal.App.5th 408, 421 [An agency's findings "'do not need to be extensive or detailed'" and "'are to be liberally construed to support rather than defeat the decision under review'".) Accordingly, the agency's findings may "'be determined to be sufficient if a court has "no trouble under the circumstances discerning 'the analytic route the administrative agency traveled from evidence to action.'"" (*West Chandler Boulevard Neighborhood Assn. v. City of Los Angeles* (2011) 198 Cal.App.4th 1506, 1521–1522 (*West Chandler*).)

C. *The Commission's Findings*

At the December 5, 2018 hearing, each member of the Commission expressed his or her view on the appeal. Commissioner Waltz Morocco then made a formal motion to grant the appeal and proposed several findings that explained the errors made by the ZA in granting the Coastal Permit and the relevant findings for overturning the ZA's grant of the CUP.

As to the Coastal Permit, the errors cited in the motion included that the ZA's decision was (1) "is in violation of the Coastal Act 30233, which prohibits diking, filling, or dredging of any wetland"; (2) "in violation of the Coastal Act 30240(b) which talks about degrading adjacent sensitive habitats and areas, specifically the Ballona Wetlands" and (3) in violation of "Coastal Act 30242, which talks about converting land that is suitable for agriculture to a nonagricultural use. There's been no evidence in the materials that I've seen that an agricultural use is not feasible here."

With respect to the CUP, Commissioner Waltz Morocco offered the following flaws in the ZA's findings: (1) "the project will not enhance the built

19

environment in the surrounding neighborhood"; (2) "it will not perform a function or provide a service that is essential or beneficial to the community" because "[t]his parking lot is basically for [the] use of Toyota"; (3) "the project's location, size, height, operations, and other significant features . . . will adversely affect or further degrade adjacent properties, surrounding neighborhoods, or public health and welfare and safety.  Meaning that if you build a parking lot and you're paving over a wetland, you're going to be changing the . . . environment, you're going to be taking down trees, and that will affect the people who live very close to this area"; and (4) "the proposal of this project [is] counter to the General Plans, policies."  (LAMC, § 12.24, subd. E [necessary findings to grant CUP]; § 12.20.2 [CDP requirements].)  The motion passed by a unanimous vote.

As additional findings, the Commission also incorporated the Commissioners' deliberation as reflected in the December 5 hearing transcript,  (*Harris v. City of Costa Mesa* (1994) 25 Cal.App.4th 963, 971 ["'In addition to the findings stated in the council's resolution, we look to the transcript of the hearing for statements made by the council members.  It is proper to look for findings in oral remarks made at a public hearing at which both parties were present, which was recorded and of which a written transcript could be made"]; see also Code Civ. Proc., § 1094.6 [contemplating a transcript in the record].)

On December 19, 2018, the Commission issued written minutes from the December 5, 2018 meeting that were stamped "Adopted" and signed by Commission President, Michael Newhouse.  The minutes state that the Commission approved Waltz Morocco's motion, granted the appeal, and adopted findings "as stated on the record by the Commission."

20

D. *Adequacy of the Findings*

The Commission's findings certainly satisfied the LAMC requirements. As required by LAMC section 12.20.2, subdivision H.4, in reversing the ZA's grant of the Coastal Permit, the Commission's decision "set forth wherein . . . [the ZA] erred in its action on the permit under the criteria set forth in Section 12.20.2G.l, [subds.] (a) through (e)." The granting of a coastal Permit requires a finding, *inter alia*, that the proposed development conforms with Chapter 3 of the Coastal Act. (LAMC, § 12.20.2, subd. G.1.) The ZA found that the Project met this requirement. In the administrative appeal, the Commission found that the ZA erred by finding that the Project conforms with Chapter 3 of the Coastal Act because the project would: (1) require diking, filling, or dredging of wetlands in violation of section 30233, (2) degrade the nearby Ballona Wetlands in violation of section 30240, subdivision (b), and (3) convert land suitable for agriculture in conflict with section 30242.

Further, as required LAMC section 12.24, subdivision I.5, the Commission reversed the ZA's grant of the CUP by making "the same findings required to be made by the initial decision-maker." Pursuant to section 12.24 of the Los Angeles Municipal Code, the ZA lacked discretion to approve the conditional use permit unless it could affirmatively find: (1) "that the project will enhance the built environment in the surrounding neighborhood or will perform a function or provide a service that is essential or beneficial to the community, city, or region"; (2) "that the project's location, size, height, operations and other significant features will be compatible with and will not adversely affect or further degrade adjacent properties, the surrounding neighborhood, or the public health, welfare, and safety"; and (3) "that the project substantially conforms with the purpose, intent and

21

provisions of the General Plan, the applicable community plan, and any applicable specific plan." (LAMC, § 12.24, subd. E.)

The Commission's findings tracked these requirements. The Commission found that the Project would: (1) not enhance the built environment or benefit the community; (2) degrade the adjacent properties and nearby Ballona Wetlands; and (3) conflict with the General Plan.

Similarly, the Commission's findings were sufficient under *Topanga* to "enable the parties to determine whether and on what basis they should seek review." (*Topanga I, supra,* 11 Cal.3d at p. 514.) *Topanga* does not bar an agency from stating its findings in the language of the applicable zoning ordinance, nor oblige the agency to support them with subfindings. (See *Young v. City of Coronado, supra,* 10 Cal.App.5th at pp. 421–423; *Levi Family Partnership, L.P. v. City of Los Angeles* (2015) 241 Cal.App.4th 123, 130–133.)

Nevertheless, relying on our decision in *West Chandler, supra,* 198 Cal.App.4th 1506, Petitioner insists that "the [Commission] here made the same mistake that the City Council did in *West Chandler*" by "paying only lip service to its standard of review without specifying how the [Zoning Administrator] supposedly erred in making his [Coastal Permit] and [Conditional Use Permit] findings." But the findings discussed above explain specifically how the ZA erred, and there is no doubt how that error occurred. In the proceeding before the ZA, Petitioner's environmental consultants used the wrong wetland identification method (the definition of wetlands under the federal USACE criteria/Clean Water Act rather than the definition under the California Coastal Act) and erroneously concluded that no wetlands existed on the site. This, in turn, resulted in the erroneous conclusion of the ZA that the Project complied with Chapter Three of the Coastal Act. (Cf. *In re Charlisse C.* (2008) 45 Cal.4th 145, 159 ["a disposition that rests on an

22

error of law constitutes an abuse of discretion"].)  Further, it also formed the basis for the Commission's findings reversing the grant of the CUP.

This case is a far cry from our decision in *West Chandler*.  In that case, the real party in interest applied for a CUP and a parking variance to demolish a one-story synagogue and build in its place a 16,100 square-foot three-story synagogue.  (*West Chandler*, 198 Cal.App.4th at p. 1510.)  The ZA approved the CUP, but limited the facility to 10,300 square feet and the assembly space to 2,400 square feet, and required 40 percent of the square footage to be at basement level.  (*Ibid*.)  Both the real party in interest and the West Chandler Boulevard Neighborhood Association appealed the decision to the planning commission, which granted the neighborhood association's appeal and effectively blocked the project.  (*Id*. at pp. 1511–1512.)

Subsequently, the Los Angeles City Council voted to assert jurisdiction over the planning commission's decision.  (*West Chandler, supra*, 198 Cal.App.4th at pp. 1511–1512.)  At the city council hearing, after the public comment portion was closed, one councilmember set forth a new "compromise" proposal and circulated it to the other council members, who voted to approve it and deny the neighborhood association's appeal.  (*Id*. at p. 1511.)  The proposal approved by the city council granted a conditional use permit to build a 12,000-square-foot building, with 20 percent of the building in the basement.  (*Ibid*.)  The assembly space was now 3,370 square feet instead of 2,400 square feet.  (*Ibid*.)  The trial court denied the neighborhood association's petition for writ of mandate, holding that the city council's decision was supported by substantial evidence.  (*Id*. at p. 1512.)

On appeal, we reversed, holding that the city council failed to set forth "how the zoning administrator erred" as required by LAMC sections 12.24

23

and 12.27. (*West Chandler, supra*, 198 Cal.App.4th at p. 1520.) Instead the city council focused on the new "compromise" proposal, with no indication of why this "compromise" proposal was necessary to remedy any errors by the ZA. (*Id.* at p. 1522.) We further observed that, "[e]ven if implicit findings of error may in some circumstances be sufficient, here the city council made no findings of error by the zoning administrator, either explicit or implicit. . . . [*T*]*he city council did not even mention the zoning administrator's findings in its decision.*" (*Id.* at p. 1521, italics added.)

Unlike in *West Chandler*, the Commission here did not adopt a proposal different from the one considered by the zoning administrator, nor did it fail to address the evidence before the ZA. Instead, the Commission identified the relevant factors for each permit, and stated on the record the reasons why the ZA erred in its determination, including that the ZA erroneously determined that no wetlands existed, which impacted the criteria for *both* the Coastal Permit and the CUP. (See Section III, *post*.) Accordingly (and as further evidenced by our discussion in Section III, *post*), the Commission's findings demonstrate "the analytic route the [Commission] traveled from evidence to action."[10] (*West Chandler, supra*, 198 Cal.App.4th at pp. 1521–1522.)

---

[10] On August 7, 2019, after Petitioner filed its writ petition in the superior court, the Planning Commission issued a "Corrected Letter of Determination" and "amended" findings on the appeal, memorializing its decision on the Coastal and Conditional Use Permits. The superior court determined that the August 2019 written findings, "adopted eight months after the [Commission] took action . . . are not the operative findings and should not be considered by the court," but found the December 5, 2018 findings on the hearing transcript compliant with the relevant standards. Since we agree that the December 5, 2018 findings, adopted by minute order on December 19, 2018, are adequate, we need not consider the August 2019 letter.

24

III.  *Substantial Evidence*

Petitioner contends the Planning Commission's findings denying the CUP and Coastal Permit are not supported by substantial evidence. Petitioner's contentions, the bulk of which simply ask us view the record in the light most favorable to Petitioner, are meritless.

"The substantial evidence rule requires the trial court to start with the presumption that the record contains evidence to sustain every finding of fact" and "[t]he burden is upon the appellant to show there is no substantial evidence whatsoever to support the findings." (*Pescosolido v. Smith* (1983) 142 Cal.App.3d 964, 970.)  In addition, when an appellant challenges "'the sufficiency of the evidence, all material evidence . . . must be set forth and not merely [its] own evidence.'" (*Toigo v. Town of Ross, supra,* 70 Cal.App.4th at p. 317.)

A. *The Coastal Permit*

The granting of a Coastal Permit requires a finding, *inter alia*, that the proposed development conforms with Chapter 3 of the California Coastal Act. (LAMC, § 12.20.2, subd. G.1.)  Because the Commission determined that this requirement was not met, and because that finding alone is adequate to uphold the Commission's decision, we focus on that finding and need not discuss other findings made by the Commission.

1. *Wetlands Development*

Chapter 3 of the Coastal Act includes section 30233, which provides in relevant part: "(a)  The diking, filling, or dredging of . . . wetlands . . . shall be

25

permitted in accordance with other applicable provisions of this division, where there is no feasible less environmentally damaging alternative, and where feasible mitigation measures have been provided to minimize adverse environmental effects, and *shall be limited to the following*." The section then lists seven types of developments in which the diking, filling, or dredging of wetlands is permitted.[11] A parking lot, such as that proposed by the Project, does not fall under any of the permitted categories.[12] As such, the Coastal Act plainly prohibits the type of development proposed by the Project in wetlands *under any circumstances*. (§ 30233, subd. (a); *Bolsa Chica Land*

---

[11] Section 30233, subdivision (a), provides in full:

"The diking, filling, or dredging of open coastal waters, wetlands, estuaries, and lakes shall be permitted in accordance with other applicable provisions of this division, where there is no feasible less environmentally damaging alternative, and where feasible mitigation measures have been provided to minimize adverse environmental effects, and shall be limited to the following:

"(1) New or expanded port, energy, and coastal-dependent industrial facilities, including commercial fishing facilities.

"(2) Maintaining existing, or restoring previously dredged, depths in existing navigational channels, turning basins, vessel berthing and mooring areas, and boat launching ramps.

"(3) In open coastal waters, other than wetlands, including streams, estuaries, and lakes, new or expanded boating facilities and the placement of structural pilings for public recreational piers that provide public access and recreational opportunities.

"(4) Incidental public service purposes, including, but not limited to, burying cables and pipes or inspection of piers and maintenance of existing intake and outfall lines.

"(5) Mineral extraction, including sand for restoring beaches, except in environmentally sensitive areas.

"(6) Restoration purposes.

"(7) Nature study, aquaculture, or similar resource-dependent activities." (§ 30233, subd. (a).)

[12] Petitioner does not claim otherwise.

26

*Trust v. Superior Court* (1999) 71 Cal.App.4th 493, 511 (*Bolsa Chica*), disapproved on another ground in *Dhillon v. John Muir Health* (2017) 2 Cal.5th 1109, 1116, fn. 2.)

Wetlands are defined in the Coastal Act as "lands within the coastal zone which may be covered periodically or permanently with shallow water and include saltwater marshes, freshwater marshes, open or closed brackish water marshes, swamps, mudflats, and fens." (§ 30121.) The applicable administrative regulations further define a wetland as "land where the water table is at, near, or above the land surface long enough to promote . . . the growth of hydrophytes."[13] (Cal. Code Regs., tit. 14, § 13577, subd. (b)(1).)

There are several methods of identifying wetlands, but only one that is permissible in the Coastal Zone. According to the Coastal Commission, a wetland must have one or more the following three attributes: (1) at least periodically, the land supports predominantly hydrophytes [i.e., wetland plants]; (2) the substrate is predominantly undrained hydric soil [i.e., wetland soil]; and (3) the substrate is nonsoil and is saturated with water or covered by shallow water at some time during the growing season of each year [i.e., wetland hydrology]. (*Kirkorowicz v. California Coastal Com.* (2000) 83 Cal.App.4th 980, 988 [applying Coastal Commission interpretive guidelines] (*Kirkorowicz*).)

In other words, the Coastal Commission employs a "one-parameter" approach, by which the satisfaction of any of these criteria indicates the presence of a wetland. This contrasts with the approach employed by federal agencies to delineate wetlands (a "three-parameter" approach), in which all three criteria must be satisfied. (*Kirkorowicz, supra*, 83 Cal.App.4th at pp.

---

[13] "A hydrophyte is 'a plant growing in water or in soil too waterlogged for most plants to survive.'" (*Dunn v. County of Santa Barbara* (2006) 135 Cal.App.4th 1281, 1293, fn. 3 (*Dunn*).)

27

989, fn. 9 & 990 ["evidence that hydrophytes exist on a property to a degree permitting jurisdictional wetland determination renders unnecessary any additional evidence of wetland hydrology or hydric soils"].)

Finally, "the Coastal Act by its definition of wetland (§ 30121) does not distinguish between wetlands according to their quality.  Indeed, section 30233 limits development in all wetlands without reference to their quality.  This is so because of the dramatic loss of over 90 percent of historical wetlands in California and their critical function in the ecosystem." (*Kirkorowicz, supra*, 83 Cal.App.4th at p. 994.)

2.  *Noncompliance with the California Coastal Act*

The evidence amply supports the Commission's finding that the Project does not comply with Chapter 3 of the California Coastal Act, because it would dike, fill, or dredge wetlands in violation of section 30233.

First, the Coastal Commission Planning Supervisor emailed the City's Department of Planning on July 27, 2018, to notify the City that the Coastal Commission considers the property to be within the dual zone "because of the *presence of a stream / wetland on the properties* which has been referred to as a drainage ditch."  (Italics added.)  The letter also informed the City that "[t]*he extent* of the wetlands on the sites will need to be determined by a qualified ecologist as part of the coastal development permit application process (i.e., wetland delineation)."

Second, biologist Roy Van de Hoek, who personally surveyed the Property on June 24, and July 7, 2018, identified 14 distinct wetlands on the "East Site" (easterly of Mindanao Way),[14] using "the one parameter

_____

[14]    This is the area identified in the second MND as "a drainage feature on the East Site [that] appears to have been excavated as part of the Marina

28

determination of preponderance and predominance of wetland vegetation[.]"[15] He further found that these areas had "greater than 50% predominance—in all cases 80-99%." Van de Hoek's report was supported by the photographic evidence and scientific data, including the GPS coordinates, for every wetland he found.

Citing the Guidelines from the United States Fish and Wildlife Service, Van de Hoek defined the five categories of plant species used in wetland delineations: Obligate Wetland Plants (OBL), Facultative Wetland Plants (FACW); Facultative Plants (FAC); Facultative Upland Plants (FACU); and Upland Plants (UPL). He noted that the upland plants "almost never occur in wetlands," while the other four categories range from "clear wetland indicator," i.e., "obligate" to "may occur in wetlands," i.e., "facultative upland plants." In his survey of the Property, Van de Hoek identified where he found the first categories of plants, including obligates and facultative wetlands plants, which are strong evidence of the presence of wetland.[16]

---

Expressway construction, as opposed to being a natural feature, and the drainage features on both project sites appear to only drain the surrounding urban areas. . . . As such, the project would not have any effect on federally protected wetlands as defined by Section 404 of the Clean Water Act." Petitioner's experts also identified this area, characterizing it as the "ditch [that] runs the length of the East Site" and "is channelized with defined bed and banks."

[15] Several of the wetlands were marked by all three criteria: hydrology (standing water), hydric soil, and dominant hydrophytic plant species. Notably, Van de Hoek observed several instances of obvious ponded water in the soft-bottom swale despite no rain having fallen in the several months before his inspection.

[16] Petitioner contends that Van de Hoek lacked sufficient expertise to provide any opinion on the issue. The argument is frivolous. Van de Hoek has degrees in environmental biology and geography; completed an

29

Third, despite Petitioner's contentions to the contrary, the evaluations of Petitioner's own environmental consultants support the conclusion that the Property contains wetlands. The report prepared by Petitioner's experts described the same five categories of plant species as Van de Hoek and acknowledged that if the "dominance test" is met, the one-parameter test used by the California Coastal Commission for the presence of wetlands is satisfied.

Petitioner's expert report acknowledged the following: "Native FACW species occurring in the ditch include an arroyo willow patch, a few scattered individual tentative lovegrass flatsedge, and western goldenrod patches. Based on their wetland plant indicator status, these areas may be considered wetlands by the CCC [California Coastal Commission]. The arroyo willow patch and western goldenrod patches are relatively large and dominate the area they cover (i.e., coverage is over 50 percent of their immediate area). Based on a one-parameter approach, these areas would be considered wetlands by the CCC." The report further found that: "mule fat occurs in uplands in the vicinity of the survey area . . . . [T]he soil test pit containing hydric soils was dug in an area dominated by mule fat. Given this association, these areas would be considered wetlands by the CCC."

Fourth, the MND circulated by the City prior to the December 5, 2018 hearing before the Planning Commission stated that "the Project will impact approximately 0.071 acre of CCC jurisdiction." The MND proposed to avoid a

environmental horticultural science certificate; completed post-graduate coursework in hydrological sciences and geography; and completed coursework in wetlands science. He worked as a wildlife biologist, botanist, archeologist, and stream hydrologist for the federal government—the United States Interior Department and United States Forest Service—for 10 years. He also worked for the County of Los Angeles as Natural Area Supervisor and Director for the Nature Center on Catalina Island.

small portion of the wetlands, while transplanting the remainder and creating a new wetland habitat. However, this type of mitigation is not permitted: the unauthorized destruction of a wetland (i.e., diking, dredging, or filling) cannot be mitigated by restoring a wetland elsewhere. (*Bolsa Chica, supra,* 71 Cal.App.4th at p. 513; *Kirkorowicz, supra*, 83 Cal.App.4th at p. 987.)

In short, substantial evidence supports the Commission's findings that the Project does not comply with Chapter 3 of the Coastal Act, because it would dike, fill, or dredge wetlands in violation of section 30233. Petitioner's contentions to the contrary amount to no more than requests for this court to reweigh the evidence, which we will not do. To the extent Petitioner also argues that "the Property is not in fact substantially composed of wetlands," the point is immaterial—the Coastal Commission prohibits the destruction of any wetland, regardless of size. (See *Kirkorowicz, supra*, 83 Cal.App.4th at p. 994 [prohibiting construction project even though only a small portion of the property contained wetlands that would be directly impacted by project]; see *also Dunn, supra*, 135 Cal.App.4th at p. 1285 [denying application to subdivide six acres in light of "two artificially created wetlands totaling approximately one-fifth of an acre"].)

B. *The CUP*

The Commission's findings denying the CUP are likewise supported by substantial evidence. First, it is clear from the Commission's findings that the wetland delineation changed the calculus of the CUP determination as well. In initially approving the project, the ZA stated "[t]he project will also be beneficial to the community by improving drainage on the site" in that "the project will replace an existing soft-sided, soft-bottomed open storm

31

drain with concrete-lined open storm drain leading to a flow-through planter." Given that the "drainage ditch" was established to contain wetlands, the Commission could reasonably conclude that the ZA erred in its determination and that there would be no benefit in replacing wetlands with a "concrete-lined" storm drain. The Commission could further find that paving over wetlands would be incompatible with the surrounding community and to the welfare of the environs. To the extent the ZA found that the project would be beneficial to the community because it would add "security and low level lighting to prevent trespassing, dumping and other nuisances on the site," the Commission could reasonably reject this determination, as Petitioner has a duty to ensure its Property does not pose a nuisance to its neighbors, regardless of whether the City allows it to build a parking lot. Further, the Project was not intended to serve as a public parking facility, but as inventory storage and employee parking for Petitioner's Toyota dealership.

In short, the Commission could reasonably conclude that, unlike commercial developments that offer services to the public, the Project merely serves the convenience of a single owner and is not "essential or beneficial to the community."

On appeal, Petitioner argues the Commission's findings are "directly contradicted by the record." However, Petitioner merely points to the evidence it believes supports the ZA's determination and/or its own position. Having examined the administrative record as a whole, and indulging all presumptions in favor of the agency's decision, we conclude the Commission's decision is supported by substantial evidence. (*Donley v. Davi* (2009) 180

32

Cal.App.4th 447, 456; *Sierra Club v. California Coastal Com.* (1993) 12 Cal.App.4th 602, 610.)[17]


### DISPOSITION

The judgment of the superior court denying the petition for writ of administrative mandamus is affirmed.

The City is entitled to costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, Acting P. J.

We concur:

COLLINS, J

CURREY, J.

---

[17] Petitioner also challenges the Commission's alternate finding that that the project would require preparation of an Environmental Impact Report (EIR) because there is a fair argument it would significantly impact the environment. However, as noted by Respondent, Petitioner failed to raise this issue before the trial court, and it is therefore deemed forfeited. (See *World Financial Group, Inc. v. HBW Ins. & Financial Services, Inc.* (2009) 172 Cal.App.4th 1561, 1569.) Petitioner does not contend otherwise in its reply brief. (See *Rudick v. State Bd. of Optometry* (2019) 41 Cal.App.5th 77, 90 [concluding appellants made an implicit concession by "failing to respond in their reply brief to the [respondent's] argument on th[at] point"].) Moreover, in light of the Commission's denial of the Project, any CEQA-related finding is no longer relevant. (*Las Lomas Land Co., LLC v. City of Los Angeles* (2009) 177 Cal.App.4th 837, 848 ["CEQA applies only to projects that a public agency proposes to carry out or approve, and does not apply to projects that the agency rejects or disapproves"], citing § 21080, subds. (a), (b)(5).)